Justice Kennedy
delivered the opinion of the Court.
This case requires us to consider whether, after we had denied certiorari and a petition for rehearing, the Court of Appeals had the power to withhold its mandate for more than five months without entering a formal order. We hold that, even assuming a court may withhold its mandate after the denial of certiorari in some cases, the Court of Appeals’ decision to do so here was an abuse of discretion.
HH
In 1985, Gregory Thompson and Joanna McNamara abducted Brenda Blanton Lane from a store parking lot in Shelbyville, Tennessee. After forcing Lane to drive them to a remote location, Thompson stabbed her to death. Thompson offered no evidence during the guilt phase of trial and was convicted by a jury of first-degree murder.
Thompson’s defense attorneys concentrated their efforts on persuading the sentencing jury that Thompson’s positive *797 qualities and capacity to adjust to prison life provided good reasons for not imposing the death penalty. Before trial, Thompson’s counsel had explored the issue of his mental condition. The trial judge referred Thompson to a state-run mental health facility for a 30-day evaluation. The resulting report indicated that Thompson was competent at the time of the offense and at the time of the examination. The defense team retained their own expert, Dr. George Copple, a clinical psychologist. At sentencing Copple testified that Thompson was remorseful and still had the ability to work and contribute while in prison. Thompson presented the character testimony of a number of witnesses, including former high school teachers, his grandparents, and two siblings. Arlene Cajulao, Thompson’s girlfriend while he was stationed with the Navy in Hawaii, also testified on his behalf. She claimed that Thompson’s behavior became erratic after he suffered head injuries during an attack by three of his fellow servicemen. In rebuttal the State called Dr. Glenn Watson, a clinical psychologist who led the pretrial evaluation of Thompson’s competence. Watson testified that his examination of Thompson revealed no significant mental illness.
The jury sentenced Thompson to death. His conviction and sentence were affirmed on direct review. State v. Thompson, 768 S. W. 2d 239 (Tenn. 1989), cert. denied, 497 U. S. 1031 (1990).
In his state postconviction petition, Thompson claimed his trial counsel had been ineffective for failing to conduct an adequate investigation into his mental health. Thompson argued that his earlier head injuries had diminished his mental capacity and that evidence of his condition should have been presented as mitigating evidence during the penalty phase of trial. Under Tennessee law, mental illness that impairs a defendant’s capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law is a mitigating factor in capital sentencing. Tenn. *798 Code Ann. §39-2-203(j)(8) (1982) (repealed); § 39-13-204(j)(8) (Lexis 2003). The postconvietion court denied relief following an evidentiary hearing, and the Tennessee Court of Criminal Appeals affirmed. Thompson v. State, 958 S. W. 2d 156 (1997). The Tennessee Supreme Court denied discretionary review.
Thompson renewed his ineffective-assistance-of-counsel claim on federal habeas. Thompson's attorneys retained a psychologist, Dr. Faye Sultan, to assist with the proceedings. At this point, 13 years had passed since Thompson’s conviction. Sultan examined and interviewed Thompson three times, questioned his family members, and conducted an extensive review of his legal, military, medical, and prison records, App. 12, before diagnosing him as suffering from schizoaffective disorder, bipolar type, id., at 20. She contended that Thompson’s symptoms indicated he was “suffering serious mental illness at the time of the 1985 offense for which he has been convicted and sentenced. This mental illness would have substantially impaired Mr. Thompson’s ability to conform his conduct to the requirements of the law.” Ibid. Sultan prepared an expert report on Thompson’s behalf and was also deposed by the State.
In February 2000, the United States District Court for the Eastern District of Tennessee granted the State’s motion for summary judgment and dismissed the habeas petition. The court held that Thompson failed to show that the state court’s resolution of his claim rested on an unreasonable application of Supreme Court precedent or on an unreasonable determination of the facts in light of the evidence presented in state court. See 28 U. S. C. § 2254(d). The District Court also stated that Thompson had not presented “any significant probative evidence that [he] was suffering from a significant mental disease that should have been presented to the jury during the punishment phase as mitigation.” No. 4:98-cv-006 (ED Tenn., Feb. 17, 2000), App. to Pet. for *799 Cert. 270. Sultan’s deposition and report, however, had apparently not been included in the District Court record.
While Thompson’s appeal to the Court of Appeals for the Sixth Circuit was pending, he filed a motion in the District Court under Federal Rule of Civil Procedure 60(b) requesting that the court supplement the record with Sultan’s expert report and deposition. Thompson’s habeas counsel at the time explained that the failure to include the Sultan evidence in the summary judgment record was an oversight. Thompson also asked the Court of Appeals to hold his case in abeyance pending a ruling from the District Court and attached the Sultan evidence in support of his motion.
The District Court denied the Rule 60(b) motion as untimely, and the Court of Appeals denied Thompson’s motion to hold his appeal in abeyance. On January 9, 2003, a divided panel of the Court of Appeals affirmed the District Court’s denial of habeas relief. Thompson v. Bell, 315 F. 3d 566. The lead opinion, authored by Judge Suhrhein-rieh, reasoned that there was no ineffective assistance of counsel because Thompson’s attorneys were aware of his head injuries and made appropriate inquiries into his mental fitness. Id., at 589-592. In particular, Thompson’s attorneys had requested that the trial court order a competency evaluation. A team of experts at the Middle Tennessee Mental Health Institute, a state-run facility, found “no mental illness, mental defect, or insanity.” Id., at 589. Dr. George Copple, the clinical psychologist retained by Thompson’s attorneys, also “found no evidence of mental illness.” Ibid. Judge Suhrheinrich emphasized that none of the experts retained by Thompson since trial had offered an opinion on his mental condition at the time of the crime. Id., at 589-592. The lead opinion contained a passing reference to Thompson’s unsuccessful Rule 60(b) motion, but did not discuss the Sultan deposition or expert report in any detail. Id., at 583, n. 13. Judge Moore concurred in the result based on Thompson’s failure to present “evidence that his counsel *800 knew or should have known either that Thompson was mentally ill or that his mental condition was deteriorating at the time of his trial or at the time of his crime.” Id., at 595.
Thompson filed a petition for rehearing. The petition placed substantial emphasis on the Sultan evidence, quoting from both her deposition and expert report. The Court of Appeals denied the petition for rehearing and stayed the issuance of its mandate pending the disposition of Thompson’s petition for certiorari.
This Court denied certiorari on December 1, 2003. 540 U. S. 1051. The following day, Thompson filed a motion in the Court of Appeals seeking to extend the stay of mandate pending disposition of his petition for rehearing in this Court. The Court of Appeals granted the motion and “ordered that the mandate be stayed to allow appellant time to file a petition for rehearing from the denial of the writ of certiorari, and thereafter until the Supreme Court disposes of the case.” App. to Pet. for Cert. 348. On January 20, 2004, this Court denied Thompson’s petition for rehearing. 540 U. S. 1158. A copy of the order was filed with the Court of Appeals on January 23,2004. The Court of Appeals, however, did not issue its mandate.
The State, under the apparent assumption that the federal habeas corpus proceedings had terminated, filed a motion before the Tennessee Supreme Court requesting that an execution date be set. The court scheduled Thompson’s execution for August 19, 2004.
From February to June 2004, there were proceedings in both state and federal courts related to Thompson’s present competency to be executed under Ford v. Wainwright, 477 U. S. 399 (1986). The state courts, after considering Sultan’s testimony (which was based in part on followup observations after her initial 1998 examination) as well as that of other experts, found Thompson competent to be executed. Thompson v. State, 134 S. W. 3d 168 (Tenn. 2004). Thompson’s Ford claim was still pending before the Federal District *801 Court when on June 23, 2004, some seven months after this Court denied certiorari, the Court of Appeals for the Sixth Circuit issued an amended opinion in Thompson’s initial federal habeas case. 373 F. 3d 688. The new decision vacated the District Court’s judgment denying habeas relief and remanded the case for an evidentiary hearing on Thompson’s ineffective-assistance-of-counsel claim. Id,., at 691-692. The Court of Appeals relied on its equitable powers to supplement the record on appeal with Sultan’s 1999 deposition after finding that it was “apparently negligently omitted” and “probative of Thompson’s mental state at the time of the crime.” Id., at 691. The court also explained its authority to issue an amended opinion five months after this Court denied a petition for rehearing: “[W]e rely on our inherent power to reconsider our opinion prior to the issuance of the mandate, which has not yet issued in this case.” Id., at 691-692. Judge Suhrheinrich authored a lengthy separate opinion concurring in part and dissenting in part, which explained that his chambers initiated the sua sponte reconsideration of the case. He agreed with the majority about the probative value of the Sultan deposition, referring to the evidence as “critical.” Id., at 733. Unlike the majority, however, Judge Suhrheinrich would have relied upon fraud on the court to justify the decision to expand the record and issue an amended opinion. Id., at 725-726, 729-742. He found “implausible” the explanation offered by Thompson’s habeas counsel for his failure to include the Sultan deposition in the District Court record, id., at 742, and speculated that counsel “planned to unveil Dr. Sultan’s opinion on the eve of Thompson’s execution,” id., at 738, n. 21.
We granted certiorari. 543 U. S. 1042 (2005).
II
At issue in this case is the scope of the Court of .Appeals’ authority to withhold the mandate pursuant to Federal Rule of Appellate Procedure 41. As relevant, the Rule provides:
*802 “(b) When Issued. The court’s mandate must issue 7 calendar days after the time to file a petition for rehearing expires, or 7 calendar days after entry of an order denying a timely petition for panel rehearing, petition for rehearing en banc, or motion for stay of mandate, whichever is later. The court may shorten or extend the time.
“(c) Effective Date. The mandate is effective when issued.
“(d) Staying the Mandate.
“(1) On Petition for Rehearing or Motion. The timely filing of a petition for panel rehearing, petition for rehearing en banc, or motion for stay of mandate, stays the mandate until disposition of the petition or motion, unless the court orders otherwise.
“(2) Pending Petition for Certiorari.
“(A) A party may move to stay the mandate pending the filing of a petition for a writ of certiorari in the Supreme Court. The motion must be served on all parties and must show that the certiorari petition would present a substantial question and that there is good cause for a stay.
“(B) The stay must not exceed 90 days, unless the period is extended for good cause or unless the party who obtained the stay files a petition for the writ and so notifies the circuit clerk in writing within the period of the stay. In that case, the stay continues until the Supreme Court’s final disposition.
“(D) The court of appeals must issue the mandate immediately when a copy of a Supreme Court order denying the petition for writ of certiorari is filed.”
Tennessee argues that the Court of Appeals was required to issue the mandate following this Court’s denial of Thompson’s petition for certiorari. The State’s position rests on Rule 41(d)(2)(D), which states that “[t]he court of appeals *803 must issue the mandate immediately when a copy of a Supreme Court order denying the petition for writ of certiorari is filed.” This provision, the State points out, admits of no exceptions, so the mandate should have issued on the date that a copy of this Court’s order denying certiorari was filed with the Court of Appeals, i. e., December 8, 2003.
The State further contends that because the mandate should have issued in December 2003, the Court of Appeals’ amended opinion was in essence a recall of the mandate. If this view is correct, the Court of Appeals’ decision to revisit its earlier opinion must satisfy the standard established by Calderon v. Thompson, 523 U. S. 538 (1998). Calderon held that “where a federal court of appeals sua sponte recalls its mandate to revisit the merits of an earlier decision denying habeas corpus relief to a state prisoner, the court abuses its discretion unless it acts to avoid a miscarriage of justice as defined by our habeas corpus jurisprudence.” Id., at 558. See also Schlup v. Delo, 513 U. S. 298 (1995); Sawyer v. Whitley, 505 U. S. 333 (1992).
Thompson counters by arguing that Rule 41(d)(2)(D) is determinative only when the court of appeals enters a stay of the mandate to allow the Supreme Court to dispose of a petition for certiorari. The provision, Thompson says, does not affect the court of appeals’ broad discretion to enter a stay for other reasons. He relies on Rule 41(b), which provides the court of appeals may “shorten or extend the time” in which to issue the mandate. Because the authority vested by Rule 41(b) is not limited to the period before a petition for certiorari is denied, he argues that the Court of Appeals had the authority to stay its mandate following this Court’s denial of certiorari and rehearing. Although the Court of Appeals failed to issue an order staying the mandate after we denied rehearing, Thompson asserts that the court exercised its Rule 41(b) powers by simply failing to issue it.
To resolve this case, we need not adopt either party’s interpretation of Rule 41. Instead, we hold that — assuming, *804 arguendo, that the Rule authorizes a stay of the mandate following the denial of certiorari and also that a court may stay the mandate without entering an order — here the Court of Appeals abused its discretion in doing so.
III
We find an abuse of discretion for the following reasons.
Prominent among our concerns is the length of time between this Court’s denial of certiorari and the Court of Appeals’ issuance of its amended opinion. We denied Thompson’s petition for certiorari in December 2003 and his petition for rehearing one month later. From this last denial, however, the Court of Appeals delayed issuing its mandate for over five months, releasing its amended opinion in June.
The consequence of delay for the State’s criminal justice system was compounded by the Court of Appeals’ failure to issue an order or otherwise give notice to the parties that the court was reconsidering its earlier opinion. The Court of Appeals had issued two earlier orders staying its mandate. The first order stayed the mandate pending disposition of Thompson’s petition for certiorari. The second order extended the stay to allow Thompson time to file a petition for rehearing with this Court and “thereafter until the Supreme Court disposes of the case.” So by the express terms of the second order the mandate was not to be stayed after this Court acted; and when we denied rehearing on January 20, 2004, the Court of Appeals’ second stay dissolved by operation of law. Tennessee, acting in reliance on the Court of Appeals’ earlier orders and our denial of certiorari and rehearing, could assume that the mandate would — indeed must — issue. While it might have been prudent for the State to verify that the mandate had issued, it is understandable that it proceeded to schedule an execution date. Thompson, after all, had not sought an additional stay of the mandate, and the Court of Appeals had given no indication that it might be revisiting its earlier decision.
*805 This latter point is important. It is an open question whether a court may exercise its Rule 41(b) authority to extend the time for the mandate to issue through mere inaction. Even assuming, however, that a court could effect a stay for a short period of time by withholding the mandate, a delay of five months is different in kind. “Basic to the operation of the judicial system is the principle that a court speaks through its judgments and orders.” Murdaugh Volkswagen, Inc. v. First National Bank of South Carolina, 741 F. 2d 41, 44 (CA4 1984). Without a formal docket entry neither the parties nor this Court had, or have, any way to know whether the court had stayed the mandate or simply made a clerical mistake. Cf. Ballard v. Commissioner, 544 U. S. 40, 59-60 (2005). The dissent claims “the failure to notify the parties was likely due to a simple clerical error” on the part of the Clerk’s office. Post, at 825 (opinion of Breyer, J.). The record lends no support to this speculation. The dissent also fails to explain why it is willing to apply a “presumption of regularity” to the panel’s actions but not to the Clerk’s. Ibid.
The Court of Appeals could have spared the parties and the state judicial system considerable time and resources if it had notified them that it was reviewing its original panel decision. After we denied Thompson’s petition for rehearing, Tennessee scheduled his execution date. This, in turn,led to various proceedings in state and federal court to determine Thompson’s present competency to be executed. See, e. g., Thompson v. State, 134 S. W. 3d 168 (Tenn. 2004). All of these steps were taken in reliance on the mistaken impression that Thompson’s first federal habeas case was final. The State had begun to “invok[e] its entire legal and moral authority in support of executing its judgment.” Calderon v. Thompson, supra, at 556-557.
The parties’ assumption that Thompson’s habeas proceedings were complete was all the more reasonable because the Court of Appeals’ delay in issuing its mandate took place *806 after we had denied certiorari. As a practical matter, a decision by this Court denying discretionary review usually signals the end of litigation. While Rule 41(b) may authorize a court to stay the mandate after certiorari is denied, the circumstances where such a stay would be warranted are rare. See, e. g., First Gibraltar Bank, FSB v. Morales, 42 F. 3d 895 (CA5 1995); Alphin v. Henson, 552 F. 2d 1033 (CA4 1977). In the typical case, where the stay of mandate is entered solely to allow this Court time to consider a petition for certiorari, Rule 41(d)(2)(D) provides the default: “The court of appeals must issue the mandate immediately when a copy of a Supreme Court order denying the petition for writ of certiorari is filed.”
By providing a mechanism for correcting errors in the courts of appeals before Supreme Court review is requested, the Federal Rules of Appellate Procedure ensure that litigation following the denial of certiorari will be infrequent. See Fed. Rule App. Proc. 40(a) (“Unless the time is shortened or extended by order or local rule, a petition for panel rehearing may be filed within 14 days after entry of judgment”). See also Fed. Rules App. Proc. 35 (rehearing en banc), 40 (panel rehearing).
Indeed, in this case Thompson’s petition for rehearing and suggestion for rehearing en banc pressed the same arguments that eventually were adopted by the Court of Appeals in its amended opinion. The Sultan evidence, first presented to the Court of Appeals as an attachment to Thompson’s motion to hold his appeal in abeyance, was quoted extensively in the petition for rehearing to the Court of Appeals. Pet. for Rehearing and Suggestion for Rehearing En Banc in No. 00-5516 (CA6), pp. 12-20, 28-31. After the request for rehearing was denied, the State could have assumed with good reason that the Court of Appeals was not impressed by Thompson’s arguments based on the Sultan evidence. The court’s opportunity to consider these arguments at the rehearing stage is yet another factor supporting *807 our determination that the decision to withhold the mandate was in error. Cf. Calderon v. Thompson, 523 U. S., at 551-553 (questioning whether a “mishandled law clerk transition” and the “failure of another judge to notice the action proposed by the original panel” would justify recalling the mandate in a nonhabeas case).
The dissent’s explanation of how the Sultan evidence was overlooked is inaccurate in several respects. For example, the statements that the “Sultan documents were not in the initial record on appeal,” post, at 821, and that “the panel previously had not seen these documents” before the rehearing stage, post, at 822, convey the wrong impression. Although the Sultan evidence was not part of the District Court’s summary judgment record, the documents were included in the certified record on appeal as attachments to Thompson’s Rule 60(b) motion. Record 133; Docket Entry 4/5/02 in No. 4:98-cv-006 (ED Tenn.); Docket Entry 4/10/02 in No. 00-5516 (CA6). The dissent also argues the petition for rehearing did not adequately bring the Sultan evidence to the attention of the Court of Appeals. Post, at 822, 826. This is simply untrue. The original panel opinion, which did not discuss the Sultan evidence in any detail, emphasized that Thompson had failed to produce any evidence that he was mentally ill at the time of his offense. 315 F. 3d, at 590; id., at 595-596 (Moore, J., concurring in result). The petition for rehearing attacked this conclusion in no uncertain terms and placed the Sultan evidence front and center. Here, for example, is an excerpt from the petition’s table of contents:
“II. THE CONCLUSION THAT THERE IS NO EVIDENCE PRESENTED IN THE RECORD OF THOMPSON’S MENTAL ILLESS AT THE TIME OF THE CRIME IS WRONG
“A. Thompson Has Set Forth Above The Record Facts Demonstrating His Mental Illness At The Time Of The Crime
*808 “B. The Majority Overlooks The Facts And Expert Opinion Set Forth In Dr. Sultan’s Report And Deposition.” Pet. for Rehearing and Suggestion for Rehearing En Banc in No. 00-5516 (CA6), p. ii.
See also id., at 1 (mentioning the Sultan evidence in the second paragraph of the statement in support of panel rehearing). The rehearing petition did not explain why Sultan’s deposition and expert report had been omitted from the summary judgment record, but that is beside the point. The petition acknowledged that the Sultan evidence was first presented to the District Court as an attachment to the Rule 60(b) motion, id., at 29, and gave the Sultan evidence a prominent and explicit mention in the table of contents. It is difficult to see how Thompson’s counsel could have been clearer in telling the Court of Appeals that it was wrong. The dissent’s treatment of this issue assumes that judges forget even the basic details of a capital case only one month after issuing a 38-page opinion and that judges cannot be relied upon to read past the first page of a petition for rehearing. The problem is that the dissent cannot have it both ways: If the Sultan evidence is as crucial as the dissent claims, it would not easily have been overlooked by the Court of Appeals at the rehearing stage.
Our review of the Sultan deposition reinforces our conclusion that the Court of Appeals abused its discretion by withholding the mandate. Had the Sultan deposition and report been fully considered in the federal habeas proceedings, it no doubt would have been relevant to the District Court’s analysis. Based on the Sultan deposition, Thompson could have argued he suffered from mental illness at the time of his crime that would have been a mitigating factor under Tennessee law and that his trial attorneys were constitutionally ineffective for failing to conduct an adequate investigation into his mental health.
Relevant though the Sultan evidence may be, however, it is not of such a character as to warrant the Court of Appeals’ *809 extraordinary departure from standard appellate procedures. There are ample grounds to conclude the evidence was unlikely to have altered the District Court’s resolution of Thompson’s ineffeetive-assistance-of-counsel claim. Sultan examined Thompson for the first time on August 20, 1998, App. 37, some 13 years after Thompson’s crime and conviction. She relied on the deterioration in Thompson’s present mental health — something that obviously was not observable at the time of trial — as evidence of his condition in 1985. (Indeed, there was a marked decline in his condition during the 6-month period between Sultan’s first two visits. Id., at 51-58.) Sultan’s findings regarding Thompson’s condition in 1985 are contradicted by the testimony of two experts who examined him at the time of trial, Dr. Watson and Dr. Copple. Watson performed a battery of tests at the Middle Tennessee Mental Health Institute, where Thompson was referred by the trial court for an examination, and concluded that Thompson “ ‘[did] not appear to be suffering from any complicated mental disorder which would impair his capacity to appreciate the wrongfulness of the alleged offenses, or which would impair his capacity to conform his conduct to the requirements of the law.’” 19 Tr. 164. Indeed, Watson presented substantial evidence supporting his conclusion that Thompson was malingering for mental illness. Id., at 151-152; 20 id., at 153-160. For example, Thompson claimed he could not read despite a B average in high school and one year’s college credit. 19 id., at 137; 20 id., at 151. Thompson’s test scores also indicated that he was attempting to fake schizophrenia. 20 id., at 153-154. Copple, the psychologist retained by Thompson’s defense team, agreed with Watson that Thompson was not suffering from mental illness. 19 id., at 58. Had the Sultan deposition been included in the District Court record, Thompson still would have faced an uphill battle to obtaining federal habeas relief. He would have had to argue that his trial attorneys should have continued to investigate his men *810 tal health even after both Watson and Copple had opined that there was nothing to uncover.
Sultan’s testimony does not negate Thompson’s responsibility for committing the underlying offense, but it does bear upon an argument that Thompson’s attorneys could have presented at sentencing. Sultan’s ultimate conclusion — that Thompson’s mental illness substantially impaired his ability to conform his conduct to the requirements of the law — is couched in the language of a mitigating factor under Tennessee law. Tenn. Code Ann. § 39 — 2—203(j)(8) (1982). See also § 39 — 13—204(j)(8) (Lexis 2003). Thompson’s trial attorneys, however, chose not to pursue a mitigation strategy based on mental illness, stressing instead character evidence from family and friends and expert testimony that he had the capacity to adjust to prison. Thompson v. State, 958 S. W. 2d, at 164-165. This strategic calculation, while ultimately unsuccessful, was based on a reasonable investigation into Thompson’s background. Sultan relied on three witnesses in preparing her report: Thompson’s grandmother, sister, and ex-girlfriend. These witnesses not only were interviewed by the defense attorneys; they testified at sentencing. Consultation with these witnesses, when combined with the opinions of Watson and Copple, provided an adequate basis for Thompson’s attorneys to conclude that focusing on Thompson’s mental health was not the best strategy. As the Tennessee Court of Criminal Appeals noted, "Because two experts did not detect brain damage, counsel cannot be faulted for discarding a strategy that could not be supported by a medical opinion.” Id., at 165.
Without a single citation to the record, the dissent suggests that Thompson’s attorneys failed to conduct adequate interviews of the defense witnesses on whom Sultan relied in her report. Post, at 827-828. Most of the information on Thompson’s childhood was provided to Sultan by Nora Jean Wharton, Thompson’s older sister. App. 16-18. Set *811 ting aside the fact that Thompson did not argue in state court that his counsel’s interview of Wharton was inadequate, Thompson v. State, supra, at 160-169, Thompson’s attorneys cannot be faulted for failing to elicit from her any details on Thompson’s difficult home life. After all, Wharton testified at trial that Thompson’s childhood was “poor,” but “very happy.” 18 Tr. 3. The dissent also implies that the experts who examined Thompson lacked information necessary to reach an accurate assessment. The record refutes this assertion. In conducting his examination, Watson had access to Thompson’s social history and military records. 19 id., at 149; 20 id., at 186 (Exh. 102, pp. 11, 27-28). Watson was also aware of the prior head injuries as well as Thompson’s claim that he heard voices. 19 id., at 152; 20 id., at 154-155. Nevertheless, Watson, whose evaluation was contemporaneous with the trial, found no evidence that Thompson was mentally ill at the time of the crime. Watson’s report was unequivocal on this point:
“‘Mr. Thompson’s speech and communication were coherent, rational, organized, relevant, and devoid of cir-cumstantiality, tangentiality, looseness of associations, paranoid ideation, ideas of reference, delusions, and other indicators of a thought disorder. His affect was appropriate to his thought content, and he exhibited no flight of ideas, manic, depressed, or bizarre behaviors, and his speech was not pressured nor rapid. He exhibited none of the signs of an affective illness. His judgment and insight are rather poor. Psychological testing revealed him to be functioning in the average range intellectually, to exhibit no signs of organicity or brain damage on the Bender-Gestalt Test and the Bender Interference Procedure. Personality profiles revealed no evidence of a psychosis, but indicated malingering in the mental illness direction. (For example, the schizophrenic score was at T 120, while clinical obser *812 vations revealed no evidence of a thought disorder.) Mr. Thompson’s memory for recent and remote events appeared unimpaired.’ ” 20 id., at 159-160.
Sultan’s testimony provides some support for the argument that the strategy of emphasizing Thompson’s positive attributes was a mistake in light of Thompson’s deteriorated condition 13 years after the trial. This evidence, however, would not come close to satisfying the miscarriage of justice standard under Calderon had the Court of Appeals recalled the mandate. Neither, in our view, did this evidence justify the Court of Appeals’ decision to withhold the mandate without notice to the parties, which in turn led the State to proceed for five months on the mistaken assumption that the federal habeas proceedings had terminated. The dissent suggests that failing to take account of the Sultan evidence would result in a “miscarriage of justice,” post, at 814-815, 828, but the dissent uses that phrase in a way that is inconsistent with our precedents. In Sawyer v. Whitley, 505 U. S., at 345-347, this Court held that additional mitigating evidence could not meet the miscarriage of justice standard. Only evidence that affects a defendant’s eligibility for the death penalty — which the Sultan evidence is not — can support a miscarriage of justice claim in the capital sentencing context. Id., at 347; Calderon, 523 U. S., at 559-560.
One last consideration informs our review of the Court of Appeals’ actions. In Calderon, we held that federalism concerns, arising from the unique character of federal habeas review of state-court judgments, and the policies embodied in the Antiterrorism and Effective Death Penalty Act of 1996 required an additional presumption against recalling the mandate. This case also arises from federal habeas corpus review of a state conviction. While the State’s reliance interest is not as strong in a case where, unlike Calderon, the mandate has not issued, the finality and comity concerns that animated Calderon are implicated here. Here a dedicated judge discovered what he believed to have been an error, *813 and we are respectful of the Court of Appeals’ willingness to correct a decision that it perceived to have been mistaken. A court’s discretion under Rule 41 must be exercised, however, in a way that is consistent with the “‘State’s interest in the finality of convictions that have survived direct review within the state court system.’ ” Id., at 555 (quoting Brecht v. Abrahamson, 507 U. S. 619, 635 (1993)). Tennessee expended considerable time and resources in seeking to enforce a capital sentence rendered 20 years ago, a sentence that reflects the judgment of the citizens of Tennessee that Thompson’s crimes merit the ultimate punishment. By withholding the mandate for months — based on evidence that supports only an arguable constitutional claim — while the State prepared to carry out Thompson’s sentence, the Court of Appeals did not accord the appropriate level of respect to that judgment. See Calderon v. Thompson, supra, at 554-557.
The Court of Appeals may have been influenced by Sultan’s unsettling account of Thompson’s condition during one of her visits. She described Thompson as being in “terrible psychological condition,” “physically filthy,” and “highly agitated.” App. 51. This testimony raised questions about Thompson’s deteriorating mental health and perhaps his competence to be executed, but these concerns were properly addressed in separate proceedings. Based on the most recent state-court decision, which rejected the argument that Thompson is not competent to be executed, it appears that his condition has improved. Thompson v. State, 134 S. W. 3d, at 184-185. Proceedings on this issue were underway in the District Court when the Court of Appeals issued its second opinion. If those proceedings resume, the District Court will have an opportunity to address these matters again and in light of the current evidence.
Taken together these considerations convince us that the Court of Appeals abused any discretion Rule 41 arguably granted it to stay its mandate, without entering a formal *814 order, after this Court had denied certiorari. The judgment of the Court of Appeals for the Sixth Circuit is reversed.

It is so ordered.