NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0670n.06
Filed: September 5, 2006

No. 05-1767

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| COMPUTER LEASCO, INC., | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | On Appeal from the United States |
| | ) | District Court for the Eastern |
| NTP, INC., DONALD E. STOUT, and THOMAS J. | ) | District of Michigan |
| CAMPANA, JR., | ) | |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

BEFORE:    BOGGS, Chief Judge; COLE, Circuit Judge; and WISEMAN, District
Judge.[*]

BOGGS, Chief Judge.    Computer Leasco, Inc. (CLI), appeals the judgment of

the district court dismissing, for failure to state a claim, their suit for relief from a prior judgment

due to fraud and state-law claims of conversion.   CLI alleges that new evidence reveals that the

defendants committed fraud in 1993 to take possession of six patents related to email and

---

[*]The Honorable Thomas A. Wiseman, Jr., United States District Judge for the Middle
District of Tennessee, sitting by designation.

messaging on mobile devices.  We affirm the district court because CLI's fraud claims were previously litigated and do not involve an officer of the court, and because the state law claims are barred by res judicata and the applicable statute of limitations.

## I

*Fraus omnia vitiat.*[1]  Although fraud vitiates everything, it must still be proven.  And the best place to prove it is at a trial, namely, the first trial.  Plaintiff in this case brings to court allegations dismissed some thirteen years ago.  The only new evidence is a witness who swears that the allegations are true.

In 1986, Andrew Andros, Ted Andros, and Roger Anderson formed Telefind, a company devoted to developing wireless messaging technologies for alphanumeric pagers.  Telefind hoped to develop text-paging products that it could market to companies like BellSouth and France Telecom.  To that end, Telefind approached engineer Thomas Campana to help with the design of the system.  Campana was, at that time, operating his own business, ESA Telecommunications, Inc., manufacturing electronic switches for paging systems.  Within a year, however, Campana's role changed from contractor to Vice President of engineering for Telefind. He became a Telefind employee and supplier, manufacturing products for Telefind through his own business.

Telefind entered into two agreements with Campana to clarify their relationship.  The first, the Key Employee Agreement, was completed on August 14, 1987.  Among other things,

---

[1]"Fraud vitiates everything."  *See Boyce's Ex'rs v. Grundy*, 28 U.S. 210, 219–20 (1830).

the agreement required that Campana devote his "full-time" to the position and not compete with Telefind in any "similar business" for a period of five years after leaving the company. Campana also agreed to stay with Telefind until their paging network was functional. Under the agreement, all intellectual property developed by Campana became Telefind's property. One year later, a Confidentiality Agreement was executed between Telefind and Campana. It affirmed that any inventions made by Campana, relating to the Telefind system, were Telefind's property.

Telefind leased equipment and financed construction of paging equipment through CLI, a company headed by one Ferris Haddad. It is Haddad's signature, as President of CLI, that appears upon the complaint.

Telefind applied for and received numerous patents during its employment of Campana. The patented inventions related to paging transmission protocols, pager design, and pager operation. Donald Stout was Telefind's patent attorney and he assisted Campana in the applications. Stout was also Campana's personal attorney, and soon to be a founder, with Campana, of NTP, a company in direct competition with Telefind.

By 1990, Telefind was experiencing financial difficulty. On January 16, 1990, CLI filed suit in the Eastern District of Michigan to collect payment pursuant to its lease agreements with Telefind. By April 1991, Campana was no longer being paid by Telefind. And on July 29, 1991, Judge La Plata, now deceased, entered final judgment against Telefind and in favor of CLI for $3.8 million owed on the lease agreements. *Computer Leasco, Inc. v. Telefind*, No. 90-60007 (E.D. Mich.) (granting final judgment to CLI). CLI attempted to execute the judgment against

Telefind in Florida but was unable to locate any assets there. Accordingly, it requested an order

from the court assigning Telefind's intellectual property to it. While that motion was pending,

Telefind filed a petition for bankruptcy in the Southern District of Florida, staying temporarily

CLI's attempts to enforce its judgment. The bankruptcy case was dismissed in October 1992 and

CLI was granted an order in aid of execution in February 1993. CLI brought that order before the

Patent and Trademark Office and asserted ownership of Telefind's patents.

During this time, according to the key affidavit in the present case, Campana and Stout

executed a fraudulent scheme to obtain possession of Telefind's intellectual property. CLI

alleges that this scheme was recently exposed to it in the sworn affidavit of Theodore Andros, the

prior Executive Vice President of Telefind. Andros has a Masters Degree in Electronic

Engineering and 40 years experience in the electronics industry. In the affidavit, Andros recounts

how CLI's Haddad came to Florida at the request of Telefind's Board of Directors to assist in

rescuing the failing company. As a major creditor, Haddad worked to identify and resolve

problems within the company. This created friction with Telefind's founders and they attempted

to disrupt his work. According to Theodore Andros:

> 21. In 1992 when it became evident that Telefind was not going to be a viable operation and that Haddad was going to foreclose on Telefind's assets, including its intellectual property and claim ownership of the intellectual property, Campana and Stout came up with a plan to steal away Telefind's valuable technology. Campana absconded with the technology generated for Telefind and proceeded to generate a new set of patents under his own name, violating his agreement that all technology accrue to Telefind.
> 22. These patent applications included the technology that was identical to the original patent applications but modified to include additional technology that was generated in order to be a part of the Telefind network. The technology was developed while Campana was under his work agreements with Telefind and

being paid by Telefind.  The technology was generated long before Telefind
ceased operations and was to be applied to the Telefind network and was to be
amended to the existing patent applications.

According to Andros, "the purpose of filing the new patent applications was to defraud the rightful owners," *i.e.*, Telefind, and eventually CLI.

As part of the scheme, in May 1991, Campana personally filed three patent applications describing the interfacing of personal computers and alphanumeric-pagers.  In March of 1992, three more patents were filed disclosing the use of a high-speed wireless protocol.  The parties refer to these patents cumulatively as the B Technology.[2]  In June 1992, Campana and Stout incorporated defendant NTP[3] and transferred the B Technology patents from Campana to NTP. In February 1993, Campana obtained a default judgment in the District of Delaware against Telefind in the amount of $481,143 for Telefind's failure to pay his wages.  *Campana v. Telefind Corp.*, No. 92-713 (D. Del. Feb. 24, 1993) (judgment).  According to the complaint in this case, Campana knew that Telefind would be unable to defend the suit and that the Delaware judgment

---

[2]CLI has identified one of the United States patents at issue as 5,436,960, the others are only identified by their patent application serial numbers.  Infringement of the '960 patent was an allegation in NTP's patent infringement claims against Canadian firm Research in Motion (RIM), culminating in a $612 million settlement paid to NTP in March 2006.  *NTP Inc. v. Research In Motion*, No. 01-767 (E.D. Va. Mar. 3, 2006) (dismissing case pursuant to settlement).  This patent is said to be worth millions by CLI, and yet it was declared invalid by the Patent and Trademark Office in February 2006 because it was predated by prior art.  *In re Campana, Jr., et al Ex Parte Reexamination Proceeding*, No. 90/006,533 (Initiated Jan. 30, 2003).  *See also RIM Provides Update on Patent Reexamination Proceeding, All Patents Remaining In Dispute Have Been Rejected*, at http://www.rim.com/news/press/2006/ pr-24_02_2006-01.shtml (last visited Aug. 10, 2006).

[3]NTP is an acronym for New Technology Protocol.

would further the fraudulent scheme by providing evidence that the B Technology was not developed for Telefind.

Days after CLI was granted its execution order against the intellectual property in 1993, NTP intervened, asserting that it owned the B Technology. The district court heard testimony on April 6, 1993 to determine who owned the property; property estimated to be worth several million dollars. CLI accused Campana of attempting to transfer Telefind's assets while the company was in bankruptcy and of lying on the stand because he was "trying to maintain an ownership position" in the technology. Campana denied the charge and testified that "the separation of the 'A Technology' from the 'B Technology' [was] not something [he] designed in order to avoid having Computer Leasco ever have a claim to the 'B Technology.'" Campana was questioned on redirect as to whether the filing of the B Technology patents was part of a fraud:

> Q: The insinuation has certainly been present in the questions that you're part of some kind of grand conspiracy to take Telefind property away from Telefind. Are you involved in any such conspiracy with Mr. Stout and Mr. Andros in any way?
> A: Absolutely not. . . .
> Q: But the separation of the "A Technology" from the "B Technology" is not something you designed in order to avoid having Computer Leasco ever have a claim to the "B Technology?"
> A: No, sir.

Roger Anderson testified that there was no "grand conspiracy" to convert the B Technology and that, as an officer of Telefind, he would have made a claim to the B Technology had he though it owned it. A patent attorney, William Wright, testified for NTP that the B Technology was "radically different" from the A Technology. Ferrel Stremler, a

University of Wisconsin professor and author of electronics textbooks, testified for CLI that the B Technology was closely related to the A Technology and merely embodied subsequent, predictable, yet clever, improvements. Finally, a former United States Commissioner of Patents, Harry F. Manbeck, Jr., was called by CLI. Manbeck testified that the B Technology was an enhancement of the A Technology, that Campana must have begun the lengthy B Technology patent applications while employed by Telefind, and that Stout had represented parties with conflicting interests in prosecution of the A Patents.

In May 1993, the district court ruled in favor of NTP. The court's interpretation of the Key Employee and Confidentiality contracts favored NTP. The judgment was predicated upon two questions: 1) whether the B Technology "pertains to the Telefind Network as described in the Business Plan," and 2) if the B Technology is "an improvement, enhancement or modification of the A Technology." The court found that it would be too expensive for Telefind to implement the B Technology. This weighed in favor of the B Technology embodying separate innovations, not merely enhancements to the A Technology. The court also credited the testimony of Anderson that Telefind didn't think it had any claim to the B Technology. Finally, the court held: "The testimony of witnesses Campana, Wright and Anderson convinces this Court that the B Technology is not an improvement, enhancement or modification of the A Technology and does not pertain to the business of Telefind."

Soon after the Michigan judgment, Campana returned to the District of Delaware to modify the default judgment he had previously obtained. Instead of damages, Campana asked the court to rescind his employment agreements with Telefind. Telefind was defunct and did not

oppose the motion and the court granted the change. *Campana v. Telefind Corp.*, No. 92-713 (D. Del. Aug. 20, 1993) (vacating award of damages and rescinding contracts).

CLI filed the complaint in this case on December 30, 2004. It presents claims for conversion under state law and for fraud. CLI prayed for relief from the 1993 judgment and damages. Attached to the complaint is the affidavit of Theodore Andros, dated December 24, 2004, making the allegations recited above. NTP and the individual defendants moved to dismiss the complaint for failure to state a claim on January 24, 2005. Fed. R. Civ. P. 12(b)(6). Oral argument was heard on April 20, 2005, and the district court granted the motion on May 5, 2005.

In its written opinion, the district court ruled that the suit was best characterized as an independent suit in equity to obtain relief from the 1993 judgment. The court considered the fraud upon the court claims independently and held that CLI did not state a claim for fraud upon the court for three reasons. First, because CLI "relies almost entirely on its allegations of perjury and fraud between the parties," they could not benefit from the leading fraud on the court case, *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 244 (1944) (holding that allegations of perjury are insufficient to state a claim for fraud upon the court). Second, the court found CLI's evidence weak: "Andros' conclusory affidavit is thus a far cry from the conclusive proof of fraud that was present in *Hazel-Atlas*." Lastly, the court held that CLI's fraud on the court allegations were incomplete because the integrity of the judicial system was not compromised by Stout, an attorney who never appeared before the court.

In ruling on CLI's request for relief from the judgment, the court found that its allegations did not meet the "'demanding standard'" that precedent requires, citing *United States v. Beggerly*, 524 U.S. 38 (1998) (relief from judgment under Fed. R. Civ. P. 60(b) independent actions should be available only to prevent a "grave miscarriage of justice"). The court also found that the evidence disclosed in the Andros affidavit was not "new evidence," and that it had been available in the previous action. The court found in a footnote that "it need not address the questions of state law that are raised in the complaint" because the res judicata effect of the previous judgment precluded their consideration. In support of this position it cited *Palkow v. CSC Transp., Inc.*, 331 F. Supp. 2d 594, 599 n.2 (N.D. Ohio 2004). This decision was subsequently reversed by this court, 431 F.3d 543 (6th Cir. 2005) (reversing dismissal and ordering a remand to state court because the district court lacked jurisdiction). The court then granted the motion to dismiss.

## II

We review a grant of a motion to dismiss for failure to state a claim de novo. Fed. R. Civ. P. 12(b)(6). *See Jackson, Tenn. Hosp. Co., LLC v. W. Tenn. Healthcare, Inc.*, 414 F.3d 608, 611 (6th Cir. 2005) (citing *AirTrans, Inc. v. Mead*, 389 F.3d 594, 597 (6th Cir.2004)). It is a question of law whether the petition was properly dismissed by the district court. *Ibid.* In our evaluation of the claim, we take all factual allegations as true and make all reasonable inferences in favor of the petitioner. *Ibid.* A motion to dismiss is properly granted if it is beyond doubt that no set of facts would entitle the petitioner to relief on his claims. *Ibid. See also In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 547 (6th Cir. 1999) ("Dismissal of a complaint is not proper

'unless it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'") (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957)).

**III**

A

Rule 60(b) of the Federal Rules of Civil Procedure is a litigant's exclusive avenue when seeking relief from a judgment or order. *See United States v. Beggerly*, 524 U.S. 38, 46 (1998) (noting that the Rule makes clear that "old forms of obtaining relief from a judgment, *i.e.*, *coram nobis*, *coram vobis*, *audita querela*, bills of review, and bills in the nature of review, had been abolished."); *George P. Reintjes Co. v. Riley Stoker Corp.*, 71 F.3d 44, 46 (1st Cir. 1995) (same). Although the Rule allows for relief from "fraud . . . , misrepresentation, or other misconduct," such relief must be sought within one year of the original judgment. *See* Fed. R. Civ. P. 60(b)(3), (6). *See also Jordan v. Paccar, Inc.*, No. 95-3478., 1996 WL 528950, at *7 (6th Cir. Sept. 17, 1996) (unpublished) (setting evidentiary and burden requirements for Fed. R. Civ. P. 60(b)(3)), *adopted by*, *Venture Indus. Corp. v. Autoliv ASP, Inc.*, ___ F.3d ___, 2006 WL 2241043, at *10 (Fed. Cir. 2006). However, the Rule contains a savings clause, preserving the state of law before its enactment in 1946, that allows judgments to be attacked without regard to the passage of time:

> This rule does not limit the power of a court to entertain an *independent action* to relieve a party from a judgment, order, or proceeding, or to grant relief to a defendant not actually personally notified . . . *or to set aside a judgment for fraud upon the court*. [Other writs] are abolished, and the procedure for obtaining any relief from a judgment shall be by motion as prescribed in these rules or by an independent action.

Fed. R. Civ. P. 60(b) (emphasis added). *See also Beggerly*, 524 U.S. at 46 (affirming the validity of the independent action to set aside a prior judgment); *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 244 (1944) (vacating a 1932 judgment for fraud on the court); *United States v. Throckmorton*, 98 U.S. 61, 65-66 (1878) (recognizing that "[w]here the unsuccessful party has been prevented from exhibiting fully his case, by fraud or deception . . . a new suit may be sustained to set aside and annul the former judgment or decree, and open the case for a new and a fair hearing."). "If the right to make a motion is lost by the expiration of the time limits fixed in these rules, the only other procedural remedy is by a new or independent action to set aside a judgment upon those principles which have heretofore been applied in such an action." Notes on 1946 Amdt. to Fed. R. Civ. P. 60.

Rule 60(b)'s savings clause draws from *Hazel Atlas* and *Throckmorton* two distinct bases for actions attacking judgments more than one year old: 1) fraud in the procurement of the judgement and 2) fraud upon the court. *See Reintjes*, 71 F.3d 44, 47–48 (reversing the district court's interpretation that only fraud upon the court allegations were proper in an independent action). Each has different required elements. *See 2300 Elm Hill Pike, Inc. v. Orlando Residence, Ltd.*, No. 97-6176, 1998 WL 808217, at *2 n.1 (6th Cir. Nov. 16, 1998) (unpublished) (noting that the two issues are frequently confused). Both are implicated by CLI's complaint and were discussed by the district court. Below, we consider and reject each theory of recovery based upon attacking the prior judgment.

1

"Independent actions must, if Rule 60(b) is to be interpreted as a coherent whole, be reserved for those cases of 'injustices which, in certain instances, are *deemed sufficiently gross* to demand a departure' from rigid adherence to the doctrine of res judicata." *Beggerly*, 524 U.S. at 46 (quoting *Hazel-Atlas*, *supra* (emphasis added)). *See also Charter Tp. of Muskegon v. City of Muskegon*, 303 F.3d 755, 760 (6th Cir. 2002) (the general purpose of Rule 60(b) is to strike a balance between the equitable principles of justice and finality); *Reintjes*, 71 F.3d 44, 47 (noting that independent actions for fraud, initiated without any time limit, must be distinct from one year-limited actions under Rule 60(b)(3)).

In *Beggerly*, the plaintiffs sought to have the Court set aside a previous judgment denying their claim of ownership to land included in a new national park. 524 U.S. at 39–40. They claimed that the government, in the prior action, had "failed to 'thoroughly search its records and make full disclosure to the [district] [c]ourt'" about the true state of the land's title. *Id.* at 47. Justice Rehnquist, writing for a unanimous Court, held that the prior judgment, vesting title in the government pursuant to a $208,175.87 payment, was "obviously" not a grave miscarriage of justice and "perhaps no miscarriage of justice at all." *Ibid. Beggerly* clearly holds "that, under the Rule, an independent action should be available only to prevent a grave miscarriage of justice." *Ibid.* This standard is more strict than the standard for relief within one year by motion under Rule 60(b)(3).

As an example of a grave miscarriage of justice, the Court identified the facts in *Marshall v. Holmes*, 141 U.S. 589 (1891). 524 U.S. at 47. In *Marshall*, the Supreme Court allowed an independent action in federal court to enjoin enforcement of several Louisiana state court

judgments. In each of the state-court trials, fraudulent evidence was introduced, resulting in default judgments against the petitioner. The Court noted that "it might be that relief could be granted by reason of the fact, distinctly alleged, that some of the necessary proof establishing the forgery of the letter was discovered after the judgments . . . and could not have been discovered by her sooner." *Marshall*, 141 U.S. at 601. *See also McDaniel v. Traylor*, 196 U.S. 415, 425 (1905) (supporting the theory that the judgments in *Marshall* were default judgments); *Throckmorton*, 98 U.S. at 65-66 (approving independent action where "the unsuccessful party has been prevented from exhibiting fully his case").

CLI has not cited a single case where a federal circuit court *has* found a grave miscarriage of justice sufficient to find for the plaintiff in an independent action case. To the contrary, many cases discuss situations that do not rise to the grave miscarriage of justice standard. *See, e.g., Buell v. Anderson*, 48 F. App'x 491, 499 (6th Cir. 2002) (failure to raise a known issue at trial); *Jacobs ex rel. Carroll v. Invisible Fence Co., Inc.*, No. 98-4549, 1999 WL 1204876, at *5 (6th Cir. Dec. 3, 1999) (unpublished) (other remedies exist at law); *Appling v. State Farm Mut. Auto. Ins. Co.*, 340 F.3d 769, 780 (9th Cir. 2003) (lack of due diligence at the prior trial); *Ballew v. U.S. Dept. of Justice*, No. 99-11308, 2000 WL 1901696, at *3 (5th Cir. Dec. 15, 2000) (unpublished) (misrepresentations and withheld information during the settlement negotiations). We believe that CLI's claims do not rise to this demanding standard.

CLI's prior litigation of the fraud subsequently claimed precludes this court from finding a grave miscarriage of justice. In *United States v. Throckmorton*, *supra*, the Court announced the rule that issues regarding the alleged fraud already litigated should not be revisited. 98 U.S. at

- 13 -

69. Because, if fraud can be grounds to overrule "the very matter . . . tried," the Court reasoned, "the number of suits would be without limit and the litigation endless." *Ibid.* In *Throckmorton*, the United States alleged fraud in the procurement of a previous judgment based upon a Mexican land grant. *Id.* at 62.

> [T]he acts for which a court of equity will on account of fraud set aside or annul a judgment or decree, between the same parties, rendered by a court of competent jurisdiction, have relation to frauds, extrinsic or collateral, to the matter tried by the first court, and not to a fraud in the matter on which the decree was rendered.
>
> * * *
>
> The genuineness and validity of the concession . . . was the single question pending before the board of commissioners and the District Court for four years. It was the thing, and the only thing, that was controverted, and it was essential to the decree. To overrule the demurrer to this bill would be to retry, twenty years after the decision of these tribunals, the very matter which they tried, on the ground of fraud in the document on which the decree was made.

*Id.* at 68–69. "*Throckmorton* stands clearly for the proposition that . . . fraudulent evidence upon which a judgment is based, is not grounds to set aside a judgment. It also makes clear that . . . fraud that was not the subject of the litigation, that infects the actual judicial process, is grounds to set aside a judgment as procured by fraud." *Fierro v. Johnson*, 197 F.3d 147, 155 (5th Cir. 1999).

It is well-established that "[a]llegations of perjury, like those advanced by [the plaintiff], are insufficient to support an independent action for relief from judgment." *Palkow v. CSX Transp., Inc.*, 431 F.3d 543, 547 (6th Cir. 2005) (citing *2300 Elm Hill Pike*, *supra*). *See also Reintjes*, 71 F.3d at 49 (perjury is insufficient to support an independent action) (listing cases). Thus, to succeed, CLI must allege some fraud that was not litigated in the prior action, a fraud that prevented a fair trial. This they have not done.

- 14 -

The record shows that CLI litigated its fraud accusations in the former action.

Specifically, issues such as conspiracy and attempts to frustrate CLI's ownership of the

B Technology were raised during the previous evidentiary hearing. They are identical to the

allegations raised in the present Andros affidavit:

> The purpose of filing the new patent application was to defraud the rightful
> owners. . . . Campana has claimed that he was released from his Telefind
> commitment. That claim is completely unfounded. . . . These representations
> were false, and it is abundantly clear to me that the Judge was mislead into
> making a colossal error in finding for NTP.

A review of the record shows that all the claims in the Andros affidavit were addressed in 1993.

Campana was questioned directly on these points by his own attorney in the prior action and he

denied any "grand conspiracy." Fraud was at issue in the prior action and CLI's claims here

merely allege that it neglected to pursue it thoroughly, even with millions of dollars in the

balance. This failure, adequately to pursue a fraud previously detected, including the failure to

question Ted Andros and other officers of Telefind who might have had information regarding

the scheme, was a failure of due diligence. For these reasons, we find that CLI's fraud claims do

not amount to a grave miscarriage of justice and that they were properly dismissed by the district

court. *Beggerly*, 524 U.S. at 47.

2

Rule 60(b) also embraces "the inherent power [that] allows a federal court to vacate its

own judgment upon proof that a fraud has been perpetrated upon the court." *Chambers v.*

*NASCO, Inc.*, 501 U.S. 32, 44 (1991) (citations omitted). "[A] wrong against the institutions set

up to protect and safeguard the public . . . cannot complacently be tolerated consistently with the

good order of society. . . . The public welfare demands that the agencies of public justice be not

so impotent that they must always be mute and helpless victims of deception and fraud."

*Hazel-Atlas*, 322 U.S. at 246.

> *Hazel-Atlas* is the leading case. Its facts have been summarized by many federal courts of

appeals:

> An attorney for Hartford had contrived to have an encomium for its patent claim
> published in a trade journal under the by-line of a disinterested expert, which was
> then presented in evidence. Hartford lost at trial, but its attorneys paraded the
> article before a panel of the court of appeals, which then reversed and entered
> judgment in Hartford's favor, supporting its opinion with quotation from the
> spurious publication. Nine years later Hazel-Atlas instigated an action to undo the
> judgment based on newly obtained evidence of Hartford's caper. The Supreme
> Court directed that judgment for Hartford be set aside and the district court's
> original order denying relief to Hartford be reinstated.

*Reintjes*, 71 F.3d at 47 (citations omitted). *See also Fraige v. Am.-Nat. Watermattress Corp.*,

996 F.2d 295, 298–99 (Fed. Cir. 1993). The Court held:

> This is not simply a case of a judgment obtained with the aid of a witness who, on
> the basis of after-discovered evidence, is believed possibly to have been guilty of
> perjury. Here, even if we consider nothing but Hartford's sworn admissions, we
> find a deliberately planned and carefully executed scheme to defraud not only the
> Patent Office but the Circuit Court of Appeals.

*Hazel-Atlas*, 322 U.S. at 245 (comparing *Marshall v. Holmes*, *supra*).

> In *Demjanjuk v. Petrovsky*, 10 F.3d 338 (6th Cir. 1993), this court vacated a district court

judgment issued eight years earlier "procured as a result of prosecutorial misconduct that

constituted fraud on the court." *Id.* at 356. The court noted that "[c]ases dealing with fraud on

the court often turn on whether the improper actions are those of parties alone, or if the attorneys

*in the case* are involved." *Ibid.* (emphasis added). The court also quoted approvingly from a

leading treatise: "[W]hen [an attorney] departs from that standard [integrity and honest dealing with the court] in the conduct of a case he perpetrates fraud upon a court." *Ibid.* (citing 7 Moore's Federal Practice and Procedure ¶ 60.33). It then noted that the outcome of two leading Supreme Court cases could be predicted through this distinction. *Hazel-Atlas* involved an attorney's misrepresentations to the court and presented a prima facie case for fraud on the court while *Throckmorton*, in contrast, did not involve any attorney misconduct and was dismissed. *Ibid.* The *Demjanjuk* court concluded:

> Thus, we hold that the [Department of Justice] attorneys acted with reckless disregard for the truth and for the government's obligation to take no steps that prevent an adversary from presenting his case fully and fairly. This was fraud on the court in the circumstances of this case where, by recklessly assuming Demjanjuk's guilt, they failed to observe their obligation to produce exculpatory materials requested by Demjanjuk.

*Id.* at 354.

Subsequent panels of this circuit have adopted *Demjanjuk*'s reasoning into the elements of the claim. They are "conduct (1) on the part of an officer of the court, (2) that is directed to the 'judicial machinery' itself, (3) that is intentionally false, wilfully blind to the truth, or is in reckless disregard for the truth, (4) That is a positive averment or is concealment when one is under a duty to disclose, and (5) that deceives the court." *Workman v. Bell*, 245 F.3d 849, 852 (6th Cir. 2001) (denying motion to reopen denial of habeas corpus for fraud on the court) (formatting and punctuation altered) (citing *Demjanjuk*, 10 F.3d at 348). *Accord Alley v. Bell*, 405 F.3d 371, 373(6th Cir. 2005); *Thompson v. Bell*, 373 F.3d 688, 730 (6th Cir. 2004) (Suhrheinrich, J., dissenting), *reversed on other grounds*, 125 S. Ct. 2825 (2005). We read these

elements to require that the individual accused of perpetrating the fraud must have directly interacted with the court to "prevent an adversary from presenting his case fully and fairly." *Demjanjuk*, 10 F.3d at 354. At most, CLI can identify cases where litigants who appeared before the court perpetrated the fraud. Even were we to accept these cases, they would not sweep widely enough to include Stout, an individual who never participated in the litigation or took steps to prevent the proper functioning of that court.

A lawyer is an officer of the court while preparing her client's case. *See Hickman v. Taylor*, 329 U.S. 495, 510 (1947). CLI attempts to expand the term "officer of the court" to include the conduct of an attorney, Stout, who never appeared before the court that entered the judgment CLI seeks relief from. In support of this argument, CLI cites to the definition of fraud upon the court in *Harbold v. Commissioner*, 51 F.3d 618 (6th Cir. 1995), as "that species of fraud which does or attempts to, defile the court itself, *or* is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication." *Id.* at 622 (internal quotations omitted). CLI relies on the disjunctive "or" in this definition to support their case. Their reading would allow a claim involving any individual not before the court to satisfy the prima facie case for fraud on the court if the fraud "defiled the court." Although this language might support CLI's argument, the holding in *Harbold* does not. In *Harbold*, the individual accused of fraud, the Commissioner's counsel Steiner, was the attorney who argued the case. Therefore, although *Harbold* dicta might support an extension of fraud upon the court to include actions by attorneys at-large, its holding does not. Furthermore, none of the actions attributed to Stout prevented the

parties from litigating the purported fraud before the district court in the original action. Stout did not defile the court.

CLI also offers a similar statement of the law from the Ninth Circuit that "fraud upon the court includes both [1] attempts to subvert the integrity of the court and [2] fraud by an officer of the court." *In re Intermagnetics Am., Inc.*, 926 F.2d 912, 916 (9th Cir. 1991). In *Intermagnetics* the CEO of the debtor in bankruptcy presented a fraudulent sale offer for the bankruptcy estate to the bankruptcy court. Although the Ninth Circuit offered a two-part definition of the cause of action, it eventually held that "[o]fficers of a debtor-in-possession are officers of the court because of their responsibility to act in the best interests of the estate as a whole and the accompanying fiduciary duties." *Id.* at 917 (citations omitted). *Intermagnetics* is thus of little help to CLI in proving that Stout, an individual who never appeared before the court in the prior litigation was, in fact, an officer of the court. The prior litigation was not before a bankruptcy court and CLI has offered no source that would impose a corresponding fiduciary duty on Stout.

Next, CLI presents *Great Coastal Express, Inc. v. The Teamsters*, 675 F.2d 1349, 1357 (4th Cir. 1982), as support for its argument that Stout was an officer of the court. This reliance is also unfounded. The *Great Coastal* court did state that "[o]ther circuits have . . . recognized that fraud on the court can occur without the involvement of attorneys," but then went on to say that "in view of our holding that the type of fraud in this case does not rise to the level of fraud on the court, we need not consider the question of attorney involvement." *Ibid.* The *Great Coastal* court cited two case in support of the proposition that fraud on the court can occur without the

involvement of an attorney before the court, *Toscano v. Commissioner*, 441 F.2d 930 (9th Cir.

1971) and *Lim Kwock Soon v. Brownell*, 369 F.2d 808 (5th Cir. 1966). We consider each.

*Lim Kwock Soon* is a case where aliens committed perjury to obtain United States

citizenship. At the district court, the petitioners were denied citizenship because the district court

did not credit their testimony. 143 F. Supp. 388 (S.D. Tex. 1956). The Fifth Circuit found the

district court's factual determinations to be clearly erroneous and reversed. *Lim Kwock Soon v.

Brownell*, 253 F.2d 809 (5th Cir. 1958). In the case cited by CLI, the Fifth Circuit vacated its

own prior judgment and remanded the case to the district court "to correct the fraud" "perpetrated

upon the courts herein by the plaintiffs and appellants, Lim Kwock Soon and Lim Kwock Min"

*Lim Kwock Soon v. Brownell*, 369 F.2d 808, 809 (5th Cir. 1966) (per curiam). Thus, this second

*Lim Kwock Soon* case is more properly described as a case of after-discovered fraud, *see supra*

Part III.A.1, an 'injustice[] which, in certain instances, [is] *deemed sufficiently gross* to demand a

departure' from rigid adherence to the doctrine of res judicata." *Beggerly*, 524 U.S. at 46. We

note that the judgment in *Lim Kwock Soon II* rests upon the validity of evidence introduced at

trial. As such, it may have been wrongly decided because "[a]llegations of perjury . . . are

insufficient to support an independent action for relief from judgment." *Palkow*, 431 F.3d at

547. However, to the extent the case was correctly decided, it does nothing to support CLI's

argument that a party who never appeared before the court can be an officer of the court.

Lastly, we consider *Toscano v. Commissioner*, *supra*. In short, *Toscano* is inapposite for

the same reasons as *Lim Kwock Soon II*: the fraud in both cases was perpetrated by individuals

who appeared before the court. In *Toscano*, an innocent party named Zelasko was charged with a

deficiency resulting from the tax returns of Toscano.  441 F.2d at 931.  Toscano had claimed to be married to Zelasko in a previous litigation involving his tax returns from 1947 to 1950.  *Ibid.* Toscano stipulated to these deficiencies and forged Zelasko's signature on documents filed with the Tax Court.  *Ibid.*  He died in 1962, and had never paid the taxes due.  *Ibid.*  The Service tried to collect from Zelasko and she moved to vacate the prior judgment.  *Ibid.*  Zelasko denied the marriage and "allege[d] that she [had] no recollection of signing the petition or any paper that was filed with the Tax Court, that she did not knowingly participate in the Tax Court proceedings, and that, until the Commissioner levied on her assets, she had no knowledge that any deficiencies had been assessed against her."  *Id.* at 931–32.  Because this fraud was committed by Toscano while before the Tax Court, *Toscano* provides no support for CLI's theory that Stout could have defiled the court in the previous action without participating in it.

We conclude that the district court was correct to dismiss CLI's fraud on the court allegations because Stout's status as an attorney does not automatically make him an officer of the court.

B

The district court dismissed CLI's state law conversion claims based upon res judicata and supported that judgment by citation to a case that was subsequently reversed.  In review, we note that the judgment of the district court, notwithstanding the reversal of its supporting authority, might still be correct.  However, we believe that the state law claims are more clearly and succinctly barred by law than equity.

Due to their age, CLI's conversion claims are barred by statute. Under Michigan law, "the period of limitations runs from the time the claim accrues," which is generally "the time the wrong upon which the claim is based was done." Mich. Comp. Laws § 600.5827. Often in case of fraud, however, although the damage is done, the putative plaintiff is unaware of her cause of action because the perpetrators subsequently conceal the crime. In cases where there has been fraudulent concealment, "the action may be commenced at any time within 2 years after the person who is entitled to bring the action discovers, or should have discovered, the existence of the claim or the identity of the person who is liable for the claim." Mich. Comp. Laws § 600.5855. Where there is no subsequent concealment to hide the fraud, the limitation period for fraud is six years. *Boyle v. Gen. Motors Corp.*, 661 N.W.2d 557, 560 (Mich. 2003); Mich. Comp. Laws § 600.5813. The discovery rule, absent concealment, does not apply to the accrual of actions for fraud in Michigan. *Boyle*, 661 N.W.2d at 560.

CLI's alleges no act on the part of the defendants that could constitute fraudulent concealment. The fraud and conversion, according to CLI, was completed in May 1993, when the district court ruled in favor of NTP. CLI alleges no act of concealment or continuing fraud after the judgment. It is obvious that acts committed before the completion of the alleged conversion cannot constitute fraudulent concealment, otherwise Michigan's fraudulent concealment statute would be converted into a general discovery rule for fraud—an outcome that Michigan courts have rejected. *Ibid.* The conversion claims are therefore barred by the applicable statute of limitations. *See Brownell v. Garber*, 503 N.W.2d 81, 86 (Mich. Ct. App. 1993) (fraudulent concealment must be alleged in the complaint); *Sills v. Oakland Gen. Hosp.*,

559 N.W.2d 348, 352 (Mich. Ct. App. 1996) ("The plaintiff must prove that the defendant

committed affirmative acts or misrepresentations that were designed to prevent subsequent

discovery. Mere silence is insufficient.").

## IV

For all these reasons, we **AFFIRM** the judgment of the district court.