**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0628n.06
Filed: October 17, 2008

**Case No. 07-1455**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| JOHN M. OKROS, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | EASTERN DISTRICT OF |
| v. | ) | MICHIGAN |
| | ) | |
| ANGELO IAFRATE CONSTRUCTION | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

**BEFORE:  BATCHELDER and SUTTON, Circuit Judges; and BARZILAY, Judge.**[*]

**ALICE M. BATCHELDER, Circuit Judge.**  John Okros sued his former employer, Angelo Iafrate Construction Company ("Iafrate"), in federal district court, claiming a violation of the Americans with Disabilities Act, 42 U.S.C.A. § 12101 *et seq.*, and asserting direct evidence of that violation.  This direct evidence — as relayed by Okros and three witnesses who listened on a speaker phone to Okros's end of a telephone conversation — was that Iafrate's Vice President of Operations, Dave Michael, admitted to firing Okros because of his Tourette's syndrome and even called Okros a "stuttering prick."  But, Dave Michael insisted that this phone call never happened.

At trial, the jury believed Okros and awarded him $1 million in damages.  After trial, however, Iafrate discovered conclusive evidence that the call had never actually occurred — i.e.,

---

[*]The Honorable Judith M. Barzilay, Judge, United States Court of International Trade, sitting by designation.

telephone company records for Okros's phone line[1] revealed that no call had been made from that phone to Iafrate or Dave Michael on the night in question. Iafrate moved the district court for a new trial, but the court — despite acknowledging a likely "fraud on the court" — denied the motion based on its finding that Iafrate could have, with due diligence, discovered this evidence earlier.

Iafrate now appeals the denial of its motion for new trial, arguing, among other things,[2] that the district court abused its discretion when it acknowledged but then ignored the perpetration of "fraud on the court" by Okros's attorney, Kenneth Hardin. Because we agree with Iafrate, we REVERSE the judgment and REMAND for further proceedings consistent with this opinion.

**I.**

From 1998 until 2001, defendant-appellant Iafrate employed plaintiff-appellee Okros as a heavy-equipment operator. Okros has Tourette's syndrome and has had it since he was five, though he is not disabled. Dave Michael was Iafrate's Vice President of Operations, who originally hired Okros in 1998 and approved Okros for a management-training program in April 2001.

According to Iafrate, Okros resigned without notice on August 31, 2001, leaving a short (and rude) telephone message for Dave Michael in which he boasted that he was taking a better job at Ford. But, on October 1, 2001, Okros returned to Iafrate, attempting to reclaim his former heavy-equipment-operator job, and a foreman named Bob Crane rehired Okros, even though Crane had no authority to do so. Because Okros had not gone through proper channels, Iafrate terminated him

---

[1]Although all of the witnesses at trial gave suspiciously different accounts of both the content of the call and the surrounding circumstances, one consistent point was that the call was placed from the land-line in Okros's spare bedroom. Okros's attorney, Kenneth Hardin, even explained, on the record, why Okros had used this particular phone.

[2]Iafrate has raised other issues and pressed additional arguments in this appeal. We find no merit to any of these other issues or arguments and, in light of our disposition of the "fraud on the court" issue, we reject those other issues and arguments, but forgo specific discussion of them in this opinion, except where otherwise noted.

immediately (October 4, 2001). Iafrate explained that heavy-equipment operation is a union job and job openings are filled from a list at the union hall. Also, the positions in Iafrate's management-training program, in which Okros had worked all of that summer, are management positions, so Okros's pay and benefits would have been entirely different from those of a heavy-equipment operator. Finally, Dave Michael, who was ultimately responsible for all hiring and firing, was still angry with Okros for the way in which he had resigned without notice in August.

According to Okros, however, he had not resigned in August, but instead had contacted Dave Michael to inform him that he was disenchanted with the training program and wanted to go back to being a heavy-equipment operator. Dave Michael allegedly agreed and even encouraged Okros to do so. Thus, according to Okros, he was properly rehired on October 1, 2001, but then fired without explanation on October 4, 2001. That evening, Okros — using a speaker-phone in the spare bedroom of his apartment, and with witnesses standing ready — made a telephone call, which he said was to Dave Michael at the Iafrate offices, seeking an explanation for why he had been fired, whereupon "Michael" revealed that he had fired Okros because Okros's Tourette's syndrome made him a liability to the company, and even called Okros a "stuttering prick."

Okros filed a charge with the EEOC and, upon obtaining a right-to-sue letter, hired Mr. Hardin and sued Iafrate in federal court claiming a violation of the Americans with Disabilities Act, 42 U.S.C.A. § 12101 *et seq.*, on a regarded-as theory.[3] During discovery, Mr. Hardin described the nature of the claim as: "[o]n or about October 4, 2001, David Michaels [sic], [Iafrate]'s officer and

---

[3]"The ADA's regarded-as-disabled . . . provision protects employees who are perfectly able to perform a job, but are rejected because of the myths, fears and stereotypes associated with disabilities. [I]t applies when an employer mistakenly believes that an employee has a physical impairment that substantially limits one or more major life activities, or . . . that an actual, non-limiting impairment substantially limits one or more of an employee's major life activities. Either application requires that the employer entertain misperceptions about the employee." *Gruener v. Ohio Cas. Ins. Co.*, 510 F.3d 661, 664 (6th Cir. 2008) (citations, quotation marks, and editorial marks omitted).

agent, and [Okros] engaged in a telephone conversation wherein Mr. Michaels [sic] specifically stated that [Okros] was being terminated because [Iafrate] regarded him as a liability due to his Tourette's Syndrome." At this point, Iafrate's defense did not address the (outrageous) telephone conversation at all, but instead, Iafrate insisted that Okros had not even been fired, let alone fired due to his disability, as no one at Iafrate even suspected that Okros had a disability. Iafrate explained:

> [Iafrate] did not terminate [Okros]. [Okros] resigned voluntarily from his employment with [Iafrate]. [Okros] later resumed the operation duties, but not the field engineer duties, he had previously performed for [Iafrate] without being rehired by [Iafrate] by circumventing [Iafrate]'s hiring/rehiring process. When this was discovered by [Iafrate], [Okros] was taken off the payroll for circumventing the rehiring process. [Iafrate] was completely unaware of [Okros]'s alleged impairment.

And, even though Iafrate was not yet focused on this aspect of the case, Dave Michael had — as he has throughout — consistently and emphatically denied that the call had ever occurred (and correspondingly, denied ever making the offensive remarks that Okros attributes to him).

The oddity of this particular denial — and Michael's stubborn insistence on it — is noteworthy. It is odd because Okros could disprove the denial so easily if it were untrue. At the opening of this case, Michael (and Iafrate) had no reason to suspect that Okros did not have, or could not get, his phone records and every reason to assume that he had them or could get them easily. Within days — if not earlier — of his termination and the purported telephone call (October 4, 2001), Okros had hired an attorney and pursued the matter with the EEOC. Even if Okros did not himself think to keep his phone bill when it arrived at the end of the month, it is certainly reasonable to assume that either his attorney or the EEOC would have counseled him to do so. If Okros had actually made the call (or *any* call to Iafrate's offices on the night in question), he could simply produce his phone bill to prove it and, with one swift parry, destroy both Michael's credibility and

4

Iafrate's defense. So, at least from this perspective, Michael's assertion that the phone call never occurred was not a very attractive defense. But, from our present perspective, it is noteworthy that this particular denial, if untrue, had such an enormous downside and such a correspondingly high probability of detection. That Michael would put so much at risk when other options (i.e., other denials) were available,[4] gives this denial added credibility in light of Okros's failure to refute it. But Iafrate did not immediately pursue this theory of defense. Instead, Iafrate made only an informal request for the phone records, and opted to pursue and emphasize its other defenses.

At trial, Dave Michael denied that the call had ever occurred and, when Iafrate emphasized Okros's failure or inability to produce his phone bill, the absence of the phone records became a key issue. Mr. Hardin represented to the jury — first as an objection during Okros's cross-examination testimony and then during his own redirect examination of Okros — that he had subpoenaed AT&T for the records in question, that AT&T had responded that the records were unavailable because AT&T does not retain those records, and that there was no possible way to get them. The implication of these representations was that, but for AT&T's obviously deficient records-retention policies, Mr. Hardin would have produced the records and proved conclusively that the call had indeed occurred. The associated implication was that Iafrate was unfairly attempting to portray Okros as a liar when it knew that Mr. Hardin had attempted to get the records, which were unavailable for reasons beyond his control. Ultimately, the jury believed Mr. Hardin — that Michael had regarded Okros as disabled and had expressed his discriminatory animus in an ignominious remark during the telephone conversation — and awarded Okros $1 million in damages.

---

[4]For example, witnesses testified that Okros was not fired, but had resigned and never been rehired. Witnesses also testified that, prior to the lawsuit, Iafrate was completely unaware of Okros's Tourette's syndrome.

Sometime after trial and the $1 million jury verdict, Iafrate decided that perhaps it should have pursued the missing phone records, and subpoenaed AT&T[5] for every number listed in Okros's personnel file (seven in all). Because, in October 2001, Okros had been living with his girlfriend, Carmen Preston, in an apartment on Union Lake Road, Iafrate determined that Okros would have made the alleged telephone call to Dave Michael from the number associated with that address.[6]

AT&T responded to the subpoena by providing an October 2001 phone bill for phone number (586) 792-4979,[7] which was addressed to Carmen Preston at the Union Lake Road address. And, upon reviewing the bill, Iafrate discovered that only four calls had originated from that number on the evening of October 4, 2001. Two calls each had been placed to two separate numbers, neither

_____

[5]Mr. Hardin moved immediately to quash the subpoena. The district court initially granted the motion and quashed the subpoena, but later recanted, admitted the records obtained as a result of the subpoena, and considered those records in ruling on the post-trial motions. The court also allowed additional subpoenas, to preserve the record.

[6]There were no phone bills for the month of October 2001 for any of the other six numbers listed on the subpoena to AT&T (i.e., listed in Okros's personnel file). AT&T's response included a handwritten note to explain the absence of phone records for the other six numbers, which stated "There were no calls for that time frame."

[7]Since Iafrate's post-trial acquisition of the phone record (with all of its various implications), much has been made of the fact that this number was indeed contained in the pretrial record (on Okros's October 31, 2001, EEOC charge), albeit with a different area code (i.e., it was listed as (810) 792-4979 whereas the correct number was (586) 792-4979). According to AT&T's website, among other public sources, former area code 810 was split and certain portions renumbered 586, beginning September 22, 2001, and becoming mandatory by March 23, 2002. *See* AT&T Area Code History - Michigan, *available at* http://www.att.com/gen/general?pid=1720 (last visited June 26, 2008).

Iafrate argues, unpersuasively, that this change in area codes should affect our analysis. But, the simple fact is that the change in area code did not adversely affect Iafrate in any way. Iafrate subpoenaed AT&T on January 29, 2007, seeking records for telephone numbers with area code 810, including (810) 792-4979. Despite this incorrect area code, AT&T responded with records for (586) 792-4979. Consequently, the change in area code had no effect on Iafrate's ability to obtain the records — before or after trial — and similarly has no effect on our present analysis.

Mr. Hardin argues, accurately, that Iafrate could have subpoenaed AT&T during the pre-trial discovery period, obtained this phone record before trial, and offered this evidence at trial to disprove the existence of the alleged call. Thus, Mr. Hardin contends that Iafrate is at fault for failing to exercise due diligence during discovery. We cannot disagree. Iafrate was certainly deficient in failing to subpoena AT&T for these records or submit any other form of formal discovery (e.g., interrogatories, requests for production, requests for admission, etc.). For this reason, among others, we reject Iafrate's claims based on newly discovered evidence or false testimony.

But, that deficiency is immaterial to the present analysis, in which the critical point is not Iafrate's due diligence, but rather, Mr. Hardin's (mis)representations at trial. For reasons that will be discussed, Iafrate's deficient discovery does not change, in any meaningful way, our analysis of Mr. Hardin's fraud on the court.

6

of which was Iafrate's office number or Dave Michael's direct line. Consequently, this telephone record confirmed that no call had been placed from the phone line in Okros and Preston's apartment to either Iafrate's general office number or Michael's direct line, thus conclusively disproving Okros's testimony and that of his witnesses who testified to what they heard on the call.

Iafrate then sought to subpoena AT&T again, this time in pursuit of information about the two numbers that *were* called from Okros's apartment on the night of October 4, 2001. Okros fought to quash these subpoenas and, in ruling on Okros's motion to quash, the district court opined:

> In light of the evidence that [Okros] committed perjury in his testimony about calling Iafrate Company on the night he was terminated, the Court will GRANT [Iafrate]'s Motion in part,[8] allowing it to subpoena AT&T's records for the purpose of preserving these [other] records should [Iafrate]'s appeal be successful.

JA 352-53. For these other two numbers, neither the subpoenas nor AT&T's responses are contained in the present record, but all indications from the parties' briefs on appeal are that Iafrate did serve the subpoenas and did obtain additional information about these two numbers from AT&T.

According to Okros's October 2001 phone bill, the first two calls on the evening of October 4, 2001, were placed to one number, the first call occurring at 6:48 p.m. (lasting one minute) and the second at 6:51 p.m. (eleven minutes). In its brief on appeal,[9] Iafrate notes that these two calls were placed to the home of Rich Moore, a union head at Ford and a friend of Okros's, who was also one of the four "witnesses" claiming to have been present at Okros's apartment to hear the call. The third and fourth calls, at 9:42 p.m. (one minute) and 9:43 p.m. (two minutes), were placed to an out-of-town attorney, Matthew Schwartz, who later confirmed to Iafrate that Okros had indeed called

---

[8]Iafrate had also sought to depose telephone company employees. The district court denied Iafrate's request for these depositions. The court was referencing this denial when it said that it was granting Iafrate's motion "in part."

[9]We include these portions of this paragraph only to complete the story and explain Iafrate's theory of what actually occurred. This is not to be construed as properly admitted evidence or a finding of fact by this court.

7

him that night on Moore's recommendation.[10]  Based on this post-trial evidence, Iafrate theorizes

that the call to Moore's home was a staged call, in which someone at Moore's home masqueraded

as Dave Michael and made the offensive comments for the benefit of Okros's witnesses.

**II.**

The district court entered judgment on the jury verdict on January 25, 2007, and therefore,

pursuant to Fed. R. Civ. P. 59(b), Iafrate had ten days to file a motion for a new trial; i.e., until

Monday, February 5, 2007.  But, as of February 5, 2007, Iafrate had not received AT&T's response

to its subpoena — Iafrate did not receive the response from AT&T (i.e., Okros's October 2001 phone

bill) until February 7, 2007.  Iafrate filed a new-trial motion on February 5, 2007, anyway, and, by

order of the court, filed a "corrected" new-trial motion on February 6, 2007, in which Iafrate redacted

certain names that had been included in the first version improperly.  Consequently, the original new-

trial motion did not address Okros's phone records or demonstrate that the telephone conversation

depicted at trial had not actually occurred.  Instead, Iafrate argued insufficiency of the evidence,

miscalculation of damages, attorney misconduct, and juror error.

After obtaining the phone bill on February 7, 2007, Iafrate moved the court (on February 9,

2007), for permission to file a supplemental brief in support of its new-trial motion.  The court

granted this request on February 12, 2007, and Iafrate submitted its supplemental brief that same day.

Iafrate argued that it had just obtained newly discovered evidence warranting a new trial, and

appended to its motion the phone bill that AT&T had supplied in response to the subpoena.  In

---

[10]A review of the entire phone record reveals that 40 of the 50 out-of-town calls on the bill were to this same number (i.e., this same attorney), beginning with the first call (September 16) and continuing to the last (October 12). Of course, no explanation has ever been sought or given as to why Okros was calling this attorney (at the suggestion of a union organizer) almost daily, beginning at least two weeks prior to his "return to work" or his termination.

arguing its motion, Iafrate quoted a passage from Okros's trial testimony in which Mr. Hardin had professed his having subpoenaed AT&T for Okros's phone bill, only to be told that phone records for Okros's numbers did not exist (to which Okros had agreed). The apparent purpose of Iafrate's reference to this testimony was to demonstrate that this was newly discovered evidence, that Mr. Hardin had misled the court about its non-existence, that Okros had perjured himself, or all of these.

On March 14, 2007 — some five weeks after Iafrate had received AT&T's response to the subpoena — the district court granted Okros's motion to quash that subpoena, and on March 19, 2007, Okros filed a brief in opposition to Iafrate's new-trial motion. In his brief, Okros argued that (1) the October 2001 phone bill was inadmissible because the court had quashed Iafrate's subpoena to AT&T, and (2) Iafrate could not satisfy the newly discovered evidence standard because Iafrate had not conducted due diligence in seeking this evidence during discovery. Iafrate replied by arguing, among other things, that the court should re-open discovery, admit the phone bill, and acknowledge Okros's perjury. The court heard argument on the motion on March 23, 2007, at the conclusion of which the court expressed its opinion — including these statements — on the record:

> There was some indication in the brief about, at the trial, where [Okros] again said that [Hardin had subpoenaed the records], but at the trial we didn't get to the actual telephone number. The questioning was, 'You knew I tried,' I think it was by [Okros]'s counsel [Hardin], 'You knew I tried to find this number and could not, not find the number but subpoena the records,' and they no longer have the records. Well, [Okros] would only know that from [Hardin]. So I don't consider that a lie.
>
> I am very bothered, and I think you both have to know that, by the fact that the records were secured and there apparently is no call to that telephone number [i.e., Dave Michael's number], that particular telephone number, but we don't know what that number was that was called. There's much we don't know about it.
>
> But in any event, that was a factual issue and [Okros] certainly could have, *could have pulled a fraud on the Court*, but how he would know that we wouldn't find the number or that, not we, I don't mean the Court but [Iafrate] wouldn't find the number, I don't know. When that number was readily available if looked for in the

9

right place. And I'm not faulting either side for that. I'm just saying it was there.

JA 266-67 (emphasis added). This statement by the district court during the disposition of its opinion demonstrates that it considered, albeit in a cursory and generalized way, the possibility that Okros and Mr. Hardin had committed a fraud on the court. In the court's ensuing order, issued that same day, the court denied the motion for a new trial "[f]or the reasons stated at [the] hearing."

On April 2, 2007, Iafrate moved the district court for relief from judgment, *see* Fed. R. Civ. P. 60(b), in which it specifically asserted fraud on the court (among other things). In denying the motion, the district court expressed its dismay at Okros's evident perjury, but dismissed Mr. Hardin's complicity in this apparent hoax. Ultimately, the court concluded that because the telephone number was contained in the file, Iafrate could have, through a more diligent investigation, obtained the records prior to trial and, presumably, protected itself against this hoax. Iafrate did not appeal the denial of its Rule 60(b) motion and, therefore, the propriety of that particular decision is not before us. On April 10, 2007, Iafrate timely appealed the denial of its Rule 59 motion for a new trial.[11]

### III.

"The decision to grant or deny motions for a new trial under Rule 59 or motions [for relief] under Rule 60(b) is discretionary with the district court." *Davis by Davis v. Jellico Comty. Hosp. Inc.*, 912 F.2d 129, 132 (6th Cir. 1990) (citations omitted). "Consequently, we review whether the district court abused its discretion. Abuse of discretion is defined as a definite and firm conviction that the trial court committed a clear error of judgment." *Id*. at 133 (quotation marks omitted).

On appeal, Iafrate contends that because the only proof of the regarded-as-disabled

---

[11]Pending appeal, Mr. Hardin moved this court to strike portions of Iafrate's appellate brief on the theory that we have no jurisdiction to hear certain issues because Iafrate (allegedly) did not preserve them for appeal. For any number of reasons, Mr. Hardin's argument is completely untenable. Consequently, this motion is denied.

misconception or any discriminatory animus came from the content of a conversation that had never actually occurred, the entire verdict was undermined and a new trial is warranted. Iafrate argues that the district court erred by failing to find fraud on the court, despite clear and unrebutted evidence. Moreover, Iafrate argues that the court abused its discretion by expressly acknowledging, during the March 23, 2007 hearing, the possibility of fraud on the court, but failing to pursue the matter.

Iafrate did not explicitly frame its Rule 59 motion for a new trial in fraud-on-the-court terms, but that does not absolutely preclude Iafrate from raising (nor prohibit from us from considering) that argument on appeal. To the contrary, we have discretion to look past a party's failure to preserve formally an issue for appeal. *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552-53 (6th Cir. 2008). Although we exercise that discretion sparingly, we will invoke it "in exceptional cases or particular circumstances" or to avert "a plain miscarriage of justice," *id*. at 552 (internal quotation marks omitted), particularly where the outcome is clear, the underlying evidence was before the district court, and the parties have fully briefed the issue on appeal, reducing the risk of unfair surprise, *cf. id.* at 552-53; *Lexicon, Inc. v. Safeco. Ins. Co. of Am., Inc.*, 436 F.3d 662, 670 n.6 (6th Cir. 2006). Here, Iafrate put forward allegations and evidence of fraud by Okros's counsel, the district court itself acknowledged the possibility of fraud, and both parties have addressed it in their briefs to this court. Accordingly, we will consider Iafrate's fraud-on-the-court claim in deciding whether the district court abused its discretion in denying Iafrate's motion for a new trial.

**IV.**

Upon obtaining the phone bill that proved that the critical telephone call described by Okros had never occurred and realizing that it had been the victim of an elaborate hoax, Iafrate sought relief from the district court under several theories, one of which was "fraud on the court."

11

> Fraud upon the court has been narrowly defined to embrace: only that species of fraud which does or attempts to, defile the court itself, or is a fraud perpetrated by officers of the court so the judicial machinery can not perform in the usual manner its impartial task of adjudging cases. It generally involves a deliberately planned and carefully executed scheme designed to subvert the integrity of the judicial process.

*Buell v. Anderson*, 48 F. App'x. 491, 499 (6th Cir. 2002) (quoting *True v. C.I.R.*, 999 F.2d 540 (6th Cir. 1993) (unpublished table opinion)) (quotation marks and footnote omitted). We have elsewhere defined "fraud on the court" — more concretely — as consisting of five elements:

> [C]onduct: (1) On the part of an officer of the court; (2) That is directed to the 'judicial machinery' itself; (3) That is intentionally false, wilfully blind to the truth, or is in reckless disregard for the truth; (4) That is a positive averment or is concealment when one is under a duty to disclose; (5) That deceives the court.

*Demjanjuk v. Petrovsky*, 10 F.3d 338, 348 (6th Cir. 1993) (parentheses added); *see also H.K. Porter Co. v. Goodyear Tire & Rubber Co.*, 536 F.2d 1115, 1118 (6th Cir. 1976).[12] Only one of these five elements, the third, is actually at issue here, as the others were fully established. For ease of analysis, we will address them out of order, dispensing with the more obvious elements first.

*1. Officer of the Court.*

Okros himself could not have committed fraud on the court because he is not (and was not) an officer of the court. The same cannot be said of Mr. Hardin or his co-counsel, Ms. Teresa Gorman, however, as they are most definitely officers of the court. *See Comp. Leasco, Inc. v. NTP, Inc.*, 194 F. App'x, 328, 338 (6th Cir. 2006) ("A lawyer is an officer of the court while preparing her

---

[12]We have also held that "intentional, fraudulent non-disclosure during discovery can form the basis of a claim of fraud upon the court." *Buell*, 48 F. App'x. at 499 (citing *Demjanjuk*, 10 F.3d at 338). In the present case, Iafrate contends that Mr. Hardin's co-counsel, Ms. Teresa Gorman, misrepresented to them — off the record, at Okros's deposition — that she had subpoenaed AT&T for Okros's phone records, but that AT&T had responded that those records were unavailable. Iafrate never submitted any formal discovery, however, or obtained any formal response from Mr. Hardin or Ms. Gorman. It is unclear whether an informal (perhaps even unsolicited) misrepresentation made during the discovery period (even if intentional and fraudulent) is enough to establish fraud on the court. But, we find that we need not resolve this question at this time. Our present "fraud on the court" inquiry is directed at Mr. Hardin's (mis)representations at trial, and we will leave for another day this question regarding informal discovery.

12

client's case.") (citing *Hickman v. Taylor*, 329 U.S. 495, 510 (1947)).

This distinction merits further mention, in that it helps explain why surprise and due diligence are not elements of this test. Mr. Hardin argues — and the district court agreed — that Iafrate was at fault for failing to exercise due diligence during discovery, and this argument ably rebuts a claim of newly discovered evidence.[13] Similarly, Mr. Hardin argues that Iafrate was aware prior to trial — i.e., it could not have been surprised — that Okros intended to testify that the call happened but he had no record of it, and this argument ably rebuts a claim of false testimony.[14] The standards for newly discovered evidence and false testimony are based, at least in part, on the fact that witnesses are subject to cross-examination, "the greatest legal engine ever invented for the discovery of truth." *California v. Green*, 399 U.S. 149, 158 (1970) (quotation marks and citation omitted). But, unlike a witness, opposing counsel is not subject to cross-examination; opposing counsel is instead obliged to operate in conformity with the oath he or she has taken as an officer of the court. *See Holloway v. Arkansas*, 435 U.S. 475, 486 (1978). Thus, counsel is entitled to rely on opposing counsel to be forthright, and is not obligated to ferret out the truth of opposing counsel's statements or satisfy due diligence in protecting against an opposing counsel's hoax.

*2. Positive Averment (or Concealment when One is Under a Duty to Disclose)*

The second element — positive averment — was clearly satisfied and is not in any dispute.

---

[13]"In order to merit a new trial based on newly discovered evidence, a defendant must establish four elements: (1) that the evidence was discovered after the trial; (2) that the evidence could not have been discovered earlier with due diligence; (3) that the evidence is material and not merely cumulative or impeaching; and (4) that the evidence would likely produce [a different outcome] if the case were retried." *United States v. Barlow*, 693 F.2d 954, 966 (6th Cir. 1982). Iafrate cannot satisfy this standard, as it did not conduct discovery with due diligence.

[14]"A new trial should be granted where the court is reasonably well satisfied that the testimony given by a material witness is false; that, without it, a jury might have reached a different conclusion; that the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after trial." *Gordon v. United States*, 178 F.2d 896, 900 (6th Cir. 1949). Iafrate cannot meet this standard.

13

Mr. Hardin's representations to the jury at trial are quoted in the record. When Iafrate attempted to cross-examine Okros about the phone records, Mr. Hardin spontaneously objected, arguing:

> MR. HARDIN: Your Honor, I'm going to place an objection to this because counsel knows that the EEOC, both he and myself have tried to get the phone bills and they are not available. I object to this line of questioning.

JA 603. On redirect examination, Mr. Hardin led Okros through the following testimony:

> [Mr. Hardin]: There were questions [by Iafrate] about the phone bill, your telephone bill from October of 2001, correct?
>
> [Okros]: Yes.
>
> [Mr. Hardin]: You are aware that I have subpoenaed those?
>
> [Okros]: Yes.
>
> [Mr. Hardin]: And the EEOC subpoenaed these?
>
> [Okros]: Yes.
>
> [Mr. Hardin]: And you are aware that the phone company has dispositively said they don't exist?
>
> [Okros]: Yes.
>
> [Mr. Hardin]: They don't retain those, correct?
>
> [Okros]: Yes.
>
> [Mr. Hardin]: So to your knowledge, is there any way possible that anyone other than myself and the EEOC and I believe [Iafrate] could get those records?
>
> [Okros]: No.

JA 663-64. These are "positive averments." In its arguments on appeal, Iafrate asserts that Mr. Hardin essentially made a three-part averment: (1) that the call actually occurred; (2) that he had sought (indeed, subpoenaed) the records to prove that it had occurred; and (3) that those records "don't exist," and that AT&T could not produce the records because "they don't retain those." The pressing question, which we will address in some detail, is whether these averments are untrue.

### 3. Directed to the Judicial Machinery Itself.

14

The third element — directed to the "judicial machinery" itself — is a matter of materiality, and there can be no doubt, in the context of this case, that these representations were material. Simply put: if the telephone call never happened (as Michael and Iafrate contend), then Mr. Hardin and Okros had no evidence of discrimination and no reasonable jury could find in their favor.

The evident purpose (and effect) of Mr. Hardin's representations was to overcome this glaring deficiency in his evidence — to persuade the jury that he had conducted an exhaustive search and, but for AT&T's obviously deficient records-retention policies, would have produced the records and proved conclusively that the call had indeed happened. The associated implication was that Iafrate was unfairly attempting to portray Okros as a liar when Iafrate knew that Mr. Hardin had attempted to get the records and that the records were unavailable for reasons beyond his control.

*4. Deceives the Court*

The fourth element — deceives the court — is a matter of prejudice, and there can be no doubt, in the context of this case, that these representations were prejudicial. Without Mr. Hardin's representations about his purported search, the jury would have been left to question why Okros did not keep his phone bill and why Mr. Hardin did not obtain a record of it from the phone company when confronted with Dave Michael's emphatic denial that the call had even occurred. Certainly, if the jury had seen the record disproving the existence of the call, it would have decided the case differently. Moreover, the jury was aware that the burden was on Mr. Hardin, as counsel for the plaintiff, to produce evidence that the alleged call had actually occurred. Had the jury known, or reasonably suspected, that Mr. Hardin had not even searched for (or had suppressed) the phone record that would have shown conclusively the existence or non-existence of the critical telephone call, then there can be little doubt that the jury would have decided the case differently.

15

### 5. *Intentionally False, Wilfully Blind, or In Reckless Disregard*

This final element concerns Mr. Hardin's state of mind and, in this case, the proper inquiry is whether he either knew his statement was false, or he was wilfully blind to the truth or acted in reckless disregard for the truth. *See Demjanjuk*, 10 F.3d at 348. As noted in the foregoing sections, Iafrate contends that Mr. Hardin made a three-part misrepresentation: (1) the call actually occurred; (2) he sought (indeed, subpoenaed) the records to prove it; and (3) the records "don't exist," or AT&T could not produce them because "they don't retain those." But, the record before us shows that the call did not occur — at least not as Okros described it. And, by all appearances, Mr. Hardin certainly did not subpoena the records, and likely conducted no search for them — at least not in the way he represented. Finally, the phone records in question *do exist* — as was proven when Iafrate obtained them from AT&T after trial, merely by submitting a subpoena. The falsity of this third representation is, by this point in time, beyond dispute, but the other two warrant some further discussion.

As for the second representation — that Mr. Hardin sought, indeed subpoenaed, these records — Iafrate explains that there is every reason to suspect this is untrue and no reason to suspect it is true. Foremost is the simple fact that when Iafrate subpoenaed the records after trial, AT&T provided them. AT&T did not allege, as Mr. Hardin had claimed, that the records did not exist or that they did not retain them. Assuming, however, that Mr. Hardin might have been misled by either Okros or AT&T, it is notable that there is no documentation to support the claim that Mr. Hardin, Ms. Gorman, or anyone else at their law firm ever subpoenaed any records, and this otherwise-unexplained absence of any documentation is amplified by the requirement of Fed. R. Civ. P. 45(b)(1) that a party serving a discovery subpoena notify the other parties. Because Mr. Hardin did

16

not notify Iafrate or the court that he or his firm had served any such subpoenas, one can reasonably presume — absent evidence to the contrary — that this failure to comply with Rule 45(b)(1), means that Mr. Hardin served no such subpoenas and his assertion at trial that he had served these subpoenas was untrue. There is also no evidence that the EEOC ever subpoenaed the records.

In looking for evidence to the contrary, we find it telling that Mr. Hardin has still produced no documentation of a subpoena or evidence of any search for the records, despite numerous opportunities to do so. In fact, since Iafrate first accused Mr. Hardin of lying about this search or subpoena, Mr. Hardin has never again asserted that he did, in fact, search for or subpoena those records. That is, Mr. Hardin has never denied this accusation, which raises an additional adverse inference. *See* Fed. R. Evid. 801(d)(2)(b) (failure to deny an accusation can serve as an admission); *Neuman v. Rivers*, 125 F.3d 315, 320 (6th Cir. 1997) (discussing adoptive admissions).

Mr. Hardin continues to represent Okros on appeal and appeared before this court for oral argument, during which he made yet another telling admission by omission. In an unprompted statement at the conclusion of his argument, Mr. Hardin said: "And, also when, post-trial, when Iafrate did subpoena the records, he used the 810 area code on the subpoena, so the 810 586 change — it changed from 810 to 586 — I don't believe that was of any consequence." That is, Mr. Hardin argued to this court that Iafrate could have and should have obtained the records earlier because the records were available even by serving a subpoena with the wrong area code, and he supported this argument by citing to the fact that Iafrate obtained the records by submitting a subpoena for phone number (810) 792-4979. Notably absent from this argument is any assertion that he or his firm had subpoenaed these records or any explanation as to why AT&T would have told him that the records were unavailable, but then provided those same records to Iafrate. Based on this evidence, a finder

17

of fact could conclude that Mr. Hardin's averment that he searched for the records is untrue.

We are left with only the first part of the three-part averment — the question of whether Okros actually called Dave Michael. For our present purpose, we consider whether there is sufficient evidence in the record to suggest that Mr. Hardin either knew his statement was false or he was wilfully blind to the truth or acted in reckless disregard for the truth. *See Demjanjuk*, 10 F.3d at 348.

The question of whether Mr. Hardin actually knew his statement was false leads ineluctably into questions of Mr. Hardin's veracity and credibility. Certain statements are telling. During oral argument before this court on appeal, Mr. Hardin seized the opportunity to insist that the call had actually occurred and explained the apparent discrepancy in the phone records this way:

| | |
|---|---|
| The Court: | Are you still maintaining that Okros called Iafrate? |
| Mr. Hardin: | Oh, absolutely. Absolutely. |
| The Court: | Then what's your explanation . . . |
| Mr. Hardin: | This phone call happened. And I want to make one thing very clear because it was raised in the reply brief that at no point did we say we disagree with their position that this phone call didn't happen. Unequivocally, this phone call happened. |
| The Court: | Okay, that's really great to have a lot of conviction about it. What's your explanation for the phone records. |
| Mr. Hardin: | . . . The phone call could have occurred on any one of probably five telephones that were in that apartment at the time; on October Fourth of 2001. If you want my opinion, I'll give it to you. It's not in the record, but it was probably Rich Moore's telephone. |

"[A]ny one of probably five telephones . . . probably Rich Moore's [cell phone]." This certainly appears to be a conceivable explanation and Mr. Hardin certainly expressed "a lot of conviction about it." And, as Mr. Hardin forewarned, this explanation is not in the record. But that is because, in the record, Mr. Hardin was unequivocal about which phone Okros used in making the alleged call to Dave Michael. During his opening statement to the jury, Mr. Hardin proclaimed — with

18

recognizable vigor — that he knew exactly which phone Okros used and why:

> John Okros went home to his apartment . . . [a]nd he picked up his phone and he put it on speaker phone, for two reasons: One, Rich Moore worked for the UAW as a committeeman and he instructed [Okros] to do so because he thought it would be good for people to hear this. Secondly, the phone wasn't working. The receiver, the part that you listen to was, you couldn't hear from it, so in order to hear what somebody was saying, you actually did have to put him on speaker phone.

JA 423-24. So, according to Mr. Hardin's earlier version of the story — also recounted with "a lot of conviction" — Okros used "*his* phone" and put it on speaker because it was broken. So, *then*, Okros used his own phone, *now* Okros probably used Rich Moore's phone — these two contradictory statements cannot both be true. Either way, this is sufficient to impugn Mr. Hardin's credibility.

During cross-examination, Iafrate pressed Okros about the phone call and the records, which led to Mr. Hardin's objection on the basis that he had subpoenaed the records:

| | |
|---|---|
| Iafrate: | And you dialed Dave Michael, is that correct? |
| Okros: | I dialed Iafrate Company. |
| Iafrate: | Okay, you dialed the main number? |
| Okros: | Yes, I did. |
| Iafrate: | And that was on speaker phone, correct? |
| Okros: | Yes, it was. |
| Iafrate: | And it was the phone in your bedroom? |
| Okros: | Yes, it was. |
| Iafrate: | Now the phone in the dining room, which is much larger, is there any reason you didn't use that phone? |
| Okros: | I don't even remember if I had a phone . . . in that room or not, I can't remember. I lived in the apartment. I had a couple of phones but I don't remember exactly. |
| Iafrate: | Okay, and that was your apartment, correct? |
| Okros: | Yes, it was. |

19

| | |
|---|---|
| Iafrate: | Did you pay the phone bill? |
| Okros: | Yes, I did. |
| Iafrate: | . . . When you made a call back in 2001, in fact, on October 4th, 2001, when you pick up the phone from your apartment building, which is where? |
| Okros: | My apartment was on Union Lake Road, Harrison Township. |
| Iafrate: | When you dial from that number to the Iafrate headquarters in Warren, Center Line, when you get the phone bill at the end of the month doesn't it show that as a toll call? |
| | [Objection] |
| Mr. Hardin: | Your Honor, I'm going to place an objection to this because counsel knows that the EEOC, both he and myself have tried to get the phone bills and they are not available. I object to this line of questioning. |

JA 602-03.

This is a peculiar objection for several reasons. First, the content of the testimony and the construction of the objection demonstrate that, at that point at least, it was a foregone conclusion that the phone line in question, and the critical phone record, was Okros's home phone line. There was no question as to whether it was Okros's phone line, no indication that there was any other phone line (e.g., five or more possible phone lines), and no suggestion that the call might have been made from anyone else's phone (e.g., Rich Moore's cell phone). It was clearly Okros's phone line.

Second, this is not merely an objection to Iafrate's questioning; it is a frank statement to the court that Mr. Hardin had "tried to get the phone bills and they [we]re not available." Third, the objection is framed as a statement of what Iafrate's "counsel knows"; yet, Mr. Hardin attested to this court, at oral argument on appeal, that "I was never asked for those phone records; not in an interrogatory, not informally, not in any way, shape, or form did counsel for Iafrate ever ask me for those phone records." This begs the question of how Iafrate would have "known" that Mr. Hardin

20

had searched for the records, if counsel had never asked, not even informally. And, fourth, this objection suggests — and it is made explicit later in the transcript — that Mr. Hardin subpoenaed AT&T for this particular record, i.e., the record for the particular phone on which Okros claims he called Iafrate; yet, as discussed previously, this is insupportable and almost certainly untrue.

Based on the foregoing, we have doubts about Mr. Hardin's veracity and reservations about assuming that Mr. Hardin did not know that Okros lied about placing the call. But, the standard — "intentionally false, wilfully blind to the truth, or [] in reckless disregard for the truth," *Demjanjuk*, 10 F.3d at 348 — does not require a finder of fact to decide whether Mr. Hardin *actually* knew. The finder of fact will need only decide whether Mr. Hardin had cause to know; i.e., whether Mr. Hardin acted in reckless disregard for the truth, given the information available.

Unless there is significant, material evidence as of yet unadmitted, Mr. Hardin had clear cause to know that he did not actually subpoena the records, conduct a search, or receive the alleged response from AT&T, and this would likely be sufficient to satisfy this element. But, it also appears from the record that Mr. Hardin also had cause to know that Okros had lied to him about placing the call. First, Dave Michael vehemently denied that it ever happened. As was discussed earlier in this opinion, this is an odd denial, deserving of some consideration. But this is certainly not all.

Okros's former live-in girlfriend, Carmen Preston (n.k.a. Carmen Dean) — who was a receptionist at Iafrate and the only potential witness, other than Okros, who actually knew Dave Michael and could recognize his voice — testified at deposition that the call did not occur and that she considered Okros the type of person who would fabricate the story, even accusing him of having engaged in insurance fraud in the past. Ms. Preston's testimony was also noteworthy because it directly contradicted Okros's prior assertion that she had been present to hear the call. This could

21

have given Mr. Hardin cause to question whether Okros had been truthful about the call.

Finally, we note the inconsistent and contradictory testimony of the defense witnesses, concerning such significant issues as who was present and what was said. Okros and Kempkens testified that four witnesses were present; Davis testified three were present; Watts testified to only two; and no two of them testified consistently about the events preceding the call or the content of the call. This could have given Mr. Hardin cause to question whether the call actually occurred.

Based on the available facts and the proper standard, as set forth in *Demjanjuk*, 10 F.3d at 348, we find that a finder of fact could reasonably conclude that Mr. Hardin committed fraud on the court. That is, one could find that Mr. Hardin, an officer of the court, made material averments that deceived the court, which he knew or should have known were untrue.

## V.

We conclude that the district court abused its discretion by ignoring the prospect of fraud on the court. We also conclude that a remand is warranted so that the district court can decide this issue using the proper standard. Therefore, we **REVERSE** the district court's denial of Iafrate's motion for a new trial and **REMAND** this case for further proceedings consistent with this opinion.